IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


RICHARD RUSSELL,
      Petitioner,

vs.                                 Case No.:  3:13cv519/LAC/EMT

FLORIDA DEPARTMENT OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 21).  Petitioner filed a reply (doc. 34).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 21).[1]  Petitioner was indicted in the Circuit Court in and for Escambia County,

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 21).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Florida, Case No. 2008-CF-3158, for first degree premeditated murder (Ex. A at 2).[2]  Following a jury trial, he was found guilty as charged (Ex. B at 241; Exs. C, D).  On September 23, 2009, Petitioner was sentenced to life imprisonment without the possibility of parole (Ex. B at 243–49; Ex. D at 279–80).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-5635 (Ex. E).  The First DCA affirmed the judgment per curiam without written opinion on September 28, 2010, with the mandate issuing October 14, 2010 (Exs. G, H).  Russell v. State, 45 So. 3d 466 (Fla. 1st DCA 2010) (Table).  Petitioner did not seek further review.

On February 18, 2011, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 1–14).  In an order rendered May 25, 2011, the state circuit court struck the motion for failing to include a proper oath (id. at 15–16). Petitioner filed an amended Rule 3.850 motion (id. at 17–30).  On June 28, 2011, the court struck the amended motion as facially insufficient (id. at 31–32).  Petitioner filed a second amended motion on July 26, 2012 (id. at 33–95).  The state circuit court summarily denied it on January 9, 2013 (Ex. J at 96–221).  Petitioner appealed the decision to the First DCA, Case No. 1D13-1634 (Ex. K).  The First DCA affirmed the judgment per curiam without written opinion on June 26, 2013, with the mandate issuing July 23, 2013 (Exs. M, N).  Russell v. State, 115 So. 3d 1007 (Fla. 1st DCA 2013) (Table).

Petitioner filed the instant federal habeas action on September 20, 2013 (doc. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

---

[2] He was originally charged with second degree murder (see Ex. A at 3), but the State upgraded the charge.

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

>     (d)  An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as determined
>> by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State court
>> proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams
v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was
described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court
> to grant a state prisoner's application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may
> issue only if one of the following two conditions is satisfied—the state court
> adjudication resulted in a decision that (1) "was contrary to . . . clearly established
> Federal law, as determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the "contrary to"
> clause, a federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this court on a question of law or if the state
> court decides a case differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court identifies the correct governing
> legal principle from this Court's decisions but unreasonably applies that principle to
> the facts of the prisoner's case.

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the
Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529
U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas,
and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was
joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had
before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683
(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed.
2d 914 (2002) (declining to consider evidence not presented to state court in determining whether
its decision was contrary to federal law).  An objectively unreasonable application of federal law
occurs when the State court "identifies the correct legal rule from Supreme Court case law but
unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or
unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."
Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's
decision represents an unreasonable application of clearly established federal law, a federal court
conducting habeas review 'may not issue the writ simply because that court concludes in its
independent judgment that the relevant state-court decision applied clearly established federal law
erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker,
633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v.
Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).  The AEDPA's
"unreasonable application" standard focuses on the state court's ultimate conclusion, not the
reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under
§ 2254(d), a habeas court must determine what arguments or theories supported or could have
supported the state court's decision, and then ask whether it is possible that fairminded jurists could
disagree that those arguments or theories are inconsistent with the holding in a prior decision of the
Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district
court may rely on grounds other than those articulated by the state court in determining that habeas
relief was not warranted, so long as the district court did not err in concluding that the state court's
rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court
holding nor an unreasonable determination of the facts).

 Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in
State court where that adjudication "resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding."  28
U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, see 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995)

(quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In <u>Anderson</u>, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  <u>Anderson</u>, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim.  *Id.*, 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan</u> <u>v. Henry</u>, 513 U.S. 364.  The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  <u>Duncan</u>, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In <u>Baldwin</u>, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  <i>Id.</i>, 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

---

[4] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

416 F.3d at 1302–03 (citations omitted).[5]

The Eleventh Circuit, prior to <u>Duncan</u>, had broadly interpreted the "fair presentation" requirement.  After <u>Duncan</u>, however, the Eleventh Circuit has taken a more narrow approach.  For example, in <u>Zeigler v. Crosby</u>, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* <u>O'Sullivan</u>, 526 U.S. at 839–40, 848; <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state

---

[5] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id.  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  See McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; see also House, 547 U.S. at 537.

Within this framework, the court will review Petitioner's claims.

IV.     PETITIONER'S CLAIMS

A.     Ground One:  "Mr. Russell was denied due process of law under the Fourteenth Amendment to the United States Constitution, when the trial court refused to allow expert testimony on Hydrocephalus, a congenital brain malformation which compromises the ability to control anger and impulsive behaviors."

Petitioner alleges the trial court violated his due process rights by excluding expert testimony from Dr. Turner that Petitioner suffered from a congenital brain malformation, which affected his ability to control anger and impulses and likely contributed to his killing the victim in this case (doc.

1 at 15–16).[7]  Petitioner alleges Dr. Turner's testimony supported his defense that he was incapable of premeditation (*id.*).  He contends the trial court's excluding the testimony denied him his right to present a defense (*id.*).

Respondent states Petitioner presented this claim on direct appeal of his conviction (doc. 21 at 11).  Respondent contends that based upon the state law cited in the State's answer brief on direct appeal, the trial court did not err in denying the admissibility of Dr. Turner's testimony as irrelevant to the issue of premeditation (*id.*).  Therefore, the First DCA's decision affirming the judgment was not an unreasonable application of federal law (*id.* at 11–12).[8]

1.      Clearly Established Federal Law

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (internal quotation and citation omitted).  However, the Supreme Court has also recognized that "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'"  Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)).  Only rarely has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.  Nevada v. Jackson, 133 S. Ct. 1990, 1992, 186 L. Ed. 2d 62 (2012) (citing Holmes, 547 U.S. at 331 (rule did not rationally serve any discernible purpose); Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (rule arbitrary); Chambers v. Mississippi, 410 U.S. 284, 302–303, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (State did not even attempt to explain the reason for its rule); Washington v. Texas, 388 U.S. 14, 22, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (rule could not be rationally defended)).  The Supreme Court has stated that Chambers "does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or

---

[7] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

[8] Respondent cites Strickland v. Washington, 466 U.S. 668 (1984) as the controlling federal law (*see* doc. 21 at 12).  Strickland applies to claims of ineffective assistance of counsel.  *See id.*  Petitioner's Ground One is a due process claim, not an ineffective assistance of counsel claim.

federal rule excludes favorable evidence." United States v. Scheffer, 523 U.S. 303, 316, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998).  Rather, due process considerations hold sway over state evidentiary rules only when the exclusion of evidence "undermine[s] fundamental elements of the defendant's defense."  *Id.*, 523 U.S. at 315.

2.      Federal Review of State Court Decision

On September 15, 2009, six days prior to commencement of Petitioner's trial, defense counsel Kelly Richards filed a notice of intent to rely on a mental health defense other than insanity. The notice indicated that Petitioner intended to rely on the defense of organic brain impairment and would seek to establish that defense through the testimony of Dr. Brett Turner (Ex. A at 193).  On September 16, 2009, the State filed a motion in limine to exclude Dr. Turner's testimony, and any other evidence that Petitioner suffered from organic brain impairment and/or cognitive disorder, on the ground that evidence of an impaired mental condition that does not rise to the level of  insanity is not admissible under Florida law (Ex. B at 232).  The court held a hearing on the State's motion on September 16, 2009 (Ex. A at 194–200, Ex. B at 201–06).  The State argued that the Florida Supreme Court held in Chestnut v. State, 538 So. 2d 820 (Fla. 1989) that evidence of an abnormal mental condition which does not rise to the level of legal insanity is inadmissible (Ex. A at 196–97). The State argued that although the Florida courts allowed for some exceptions to this general rule of inadmissibility, for example, in cases where a defendant suffered from a generally recognized incapacitating circumstance, Petitioner's circumstance did not fall within an exception and instead was a general mental impairment (*id.* at 196–99).

Defense counsel advised the court that she had not had an opportunity to confer with Dr. Turner regarding his report, but that Petitioner's condition appeared to be a physical condition as opposed to a psychological condition, and thus may qualify under an exception to the general rule of inadmissibility (Ex. A at 1999–200, Ex. B at 201).  Defense counsel then indicated that she might be able to provide more insight into what Dr. Turner's testimony would be after she had an opportunity to speak to Dr. Turner:

> MS. RICHARDS:  I think in my speaking with Dr. Turner it mentions blackouts and I think that's something that Mr. Russell suffers from.  I don't think it was mentioned specifically in his report and that's something that I wanted to discuss with him.

MS. NEEL [the prosecutor]:  Okay.

THE COURT:  Well, you know, unless you can come up with something more definitive that's going to actually make it an exception to the rule, you know, I'm inclined to grant the motion . . . .

MS. RICHARDS:  Yes, sir, and it may be that we would, depending upon what happens in this case, just use Dr. Turner at sentencing.

(Ex. B at 201, 203–04).

After some discussion of whether Dr. Turner's testimony would be relevant at sentencing, the following discussion occurred:

THE COURT:  Okay.  So, you know, unless you get ahold of me and say we think that we've got something that will make an exception, then the ruling is going to be, motion granted, he can't testify as to the guilt phase but, you know, in relation to, you know, if it is discretionary at a sentencing, sure.  I don't have a problem with that.

MS. RICHARDS:  Yes, sir. Thank you.

THE COURT:  So I'm not going to do anything unless I hear from you.

MS. RICHARDS:  Yes, sir.

THE COURT:  Because if I don't hear from you then the motion is granted, he doesn't testify.

MS. RICHARDS:  Yes, sir.

(Ex. B at 205–06).  Dr. Turner's report was filed with the court (Ex. B at 202), and is included in the record (*id.* at 208–19).

Dr. Turner's report indicates that Petitioner told Dr. Turner that he acted in self-defense when he killed the victim (Ex. B at 209).  After describing Petitioner's performance on various tests, Dr. Turner's report concluded:

**SUMMARY AND RECOMMENDATIONS:**

Mr. Russell exhibits mild symptoms of Organic Brain Impairment, and his deficits meet the criteria for Cognitive Disorder Not Otherwise Specified.  Specifically, he

exhibits mild symptoms of frontal lobe dysfunction.  He also exhibits mild deficits with visual memory as well as some mild impairment with verbal memory to a lesser degree than his visual memory deficits.  In addition, Mr. Russell has a well documented developmental history of having hydrocephalus as a child.  He also has a history of aggressive and hostile behavior which appears to be the result of organic brain impairment resulting from the hydrocephalus.  Throughout his adult life he has continued to have problems controlling his anger, and impulsive behaviors, and these problems are consistent with Organic Brain Impairment.  His cognitive deficits are mild, but compromise his ability to effectively modulate his emotions, control impulsive behavior, and carefully consider his options when confronted with an emotionally charged situation.  As such, it is likely that his brain impairment was a contributing factor in the instant offense, as well as many other aggressive and hostile acts throughout his life.

Personality testing with Mr. Russell also revealed that he has learned to be a socially outgoing person who is typically able to make a good first impression.  However, he has difficulty in interpersonal relationships due to his lack of consideration for the feelings of others.  In addition, he has not developed effective coping skills for his anger, and his low tolerance for frustration causes him to be prone to hostile outbursts.   His substance abuse also has likely exaggerated his maladaptive personality characteristics.  Ironically, he was reportedly abusing substances as a form of self-medication to treat his anxiety symptoms.

This client could benefit from a referral to a neurologist or psychiatrist to determine if medication could be helpful in treating his symptoms of anxiety and his impulsive and hostile outbursts.  It would also be appropriate for him to have a comprehensive evaluation by a neurologist to determine if any other treatment options may be available to him.  He also could benefit from long-term psychotherapy to help him learn more adaptive coping skills for conflict, anger and stress.   However, psychotherapy would likely only be effective if it is implemented as a "long-term" treatment option.  In the event that Mr. Russell is sentenced to prison, it is hoped that he will have access to a treatment team of mental health professionals, as well as a neurologist and/or psychiatrist to provide coordinated care for his condition.

(Ex. B at 218–19).

Petitioner's trial was held September 21–23, 2009 (Exs. C, D).  The victim of the killing was Petitioner's girlfriend, Kendall Rogers.  Petitioner's theory of defense was that although the evidence showed that Petitioner was responsible for Kendall Rogers's death, it did not prove that the killing was premeditated (Ex. C at 61–62).

Carol Martel, Kendall's aunt, testified that on June 23, 2008, Kendall was living with her three-year-old daughter, Kaydence, and Petitioner (Ex. C at 63–65). Ms. Martel testified that on that day, Kendall asked her if Kaydence could live with her for a little while. She testified that Kendall delivered Kaydence to her, along with paternity documents and Kaydence's social security card, immunization records, medical insurance cards, toys, and clothes. Ms. Martel testified that Kendall drove a white GMC truck that she had given Kendall.

Charlie Finch testified that he was employed at Arety's Angels, and Kendall Rogers was also employed there in June of 2008 (Ex. C at 66–67). He testified that one of his duties was to escort the female employees to their vehicles at the end of their shifts. He testified that he escorted Kendall to her vehicle at 4:00 a.m., on June 24, 2008, and the vehicle was a white Impala car. He testified that he had seen her drive that car "a couple of times" in the past. He testified that he was certain he did not escort her to a truck that night.

Gary Hodge, a manager with Arety's Angels, testified that Kendall Rogers was employed as a cocktail waitress (Ex. C at 68–73). He testified that on June 23, 2008, Kendall arrived at Arety's at 7:30 p.m. and got off work at 4:00 a.m. on June 24. He testified that Arety's was equipped with video surveillance, which covered the parking lot. He testified he retrieved a video of Kendall leaving Arety's on June 24, 2008, and provided it to the Sheriff's Office. The videotape was published to jury. Mr. Hodge testified that the videotape showed Charlie Finch walking Kendall to her car, Finch returning to the bar, and Kendall driving off the premises.

Deputy Tama Barber testified that at 3:45 p.m. on June 24, 2008, D'Aundra Evans walked into the Escambia County Sheriff's Office, accompanied by his aunt, Ms. McCall (Ex. C at 109–15). Deputy Barber interviewed Evans and then drove with him and another deputy to a location off South Loop Road to what appeared to be a freshly dug mound of dirt with branches and debris on top. Crime scene technician Christine Percell testified that she arrived at the South Loop road area around 5:30 p.m. on June 24, 2008, and uncovered the mound of dirt enough to see a person buried there (id. at 145–53). The person was pronounced dead, and law enforcement secured the scene.

Deputy Smeester testified that on June 24, 2008, at approximately 6:25 p.m., he and Investigator Bobby Guy accompanied D'Aundra Evans to Alabama (Ex. C at 119–33, 136–42). He testified that they stopped at a USA Travel convenience store in Elberta, Alabama, where Evans had

bought gas for two vehicles.  He testified they then proceeded to a BP gas station, where they recovered two shoes and a broken shovel from a dumpster.  Deputy Smeester testified they drove to a Tom Thumb convenience store, where they recovered a red comforter from a dumpster.  He testified that at a fourth gas station, a Shell station, they recovered a white shopping bag filled with damp clothing, including a pair of pink shorts, a pair of boxer briefs, a towel and wash cloth, and a white T-shirt that had the word "Russell" handwritten in the collar.  Deputy Smeester testified that the last stop was Tanger Outlets, where D'Aundra Evans led the officers to a vehicle.

D'Aundra Evans testified that he knew Kendall Rogers and Petitioner, who he referred to as "Rick" (Ex. C at 76–104).  He testified that he lived with Petitioner and Kendall, and babysat Kendall's child and Petitioner's child.  Evans testified that Petitioner had a child with D'Aundra's sister, and D'Aundra thought of Petitioner as a big brother.  Evans testified that on June 24, 2008, around 6:00 a.m., Petitioner picked him up at his (Evans's) sister's house.  Petitioner told D'Aundra that he had killed Kendall, and they were going to bury her.  Evans testified they drove, in Petitioner's white Impala, to the apartment where Petitioner and Kendall lived.  Evans testified that Kendall's truck was outside.  He testified he and Petitioner went inside the apartment, and Petitioner pulled Kendall's body out of the bedroom wrapped in a red blanket.  Petitioner showed him Kendall's stomach and was giggling.  Evans testified they put the body in the back of the truck and drove to the woods near Petitioner's grandparents' house.  He testified they left the truck parked in the woods and went to Petitioner's grandparents' house to get a "four-wheeler" and shovels.  Evans testified they returned to the truck and put the body on the back of the four-wheeler and went into the woods.  He testified they dug a hole, and Petitioner put the body in the hole and covered it up.  He testified they put the blanket in the back of the truck and took the four-wheeler back to Petitioner's grandparents' house.  Evans testified they returned to Petitioner's apartment, where Petitioner showered, and D'Aundra cleaned a wall by the bathroom that Petitioner told him to clean.  Evans testified he did not see anything on the wall, no blood, dirt, or marks, but he noticed water, toys, and hair that looked like Kendall's in the bathtub.  Evans testified he and Petitioner drove to Foley, Alabama, with Petitioner driving Kendall's truck, and Evans driving Petitioner's Impala.  He testified they took some of Kendall's clothes, which were pink, and a blanket.  He testified they stopped for gas along the way.  Video surveillance photos from the USA Travel convenience store

showed Evans and Petitioner and their vehicles at the gas station.  Evans testified that once in Alabama, they went to a several other gas stations, where they put clothes, shoes, a shovel, and the blanket in dumpsters.  Evans testified that they left Kendall's truck at an outlet center to make it look like she was with someone.  He testified that he did what Petitioner told him to do because he was scared.  He testified they drove back to his (Evans's) sister's house in the Impala, and, on the way, Petitioner threw Kendall's cell phone out the window.  Evans testified that when they arrived at his sister's house, between 11:00 a.m. and noon, he walked up the stairs, and Petitioner was right behind him.  He testified that his sister and Petitioner went grocery shopping, while he stayed home with his nephews.  Evans testified that when his sister and Petitioner returned, he (Evans) went to his aunt's house and told her what happened.  He testified that his aunt took him to the police, where he spoke to an officer and then took the police to the wooded area and to Alabama.  Evans testified that Petitioner was angry that Kendall was working at Arety's Angels.  He testified he saw them argue a lot.  Evans testified that he had seen Kendall hit Petitioner.  Evans testified that Petitioner did not behave that way with his (Evans's) sister—he testified that they argued but did not push and shove each other.  Evans testified that Petitioner and Kendall "kissed and made up" after they had an argument.  He testified that Petitioner was a good father.

Petitioner's grandmother, Betty Jo Russell, testified that Petitioner came to her house on South Loop Road at approximately 7:00 a.m. on June 24 to pick up a four-wheeler, and he was gone for approximately an hour (Ex. C at 105–08).  Mrs. Russell testified that she did not see anyone with Petitioner, nor did she see the vehicle he was driving.

Jennifer Hatler, a crime laboratory analyst for the Florida Department of Law Enforcement, testified that she compared samples of DNA from Petitioner and Kendall Rogers with DNA from the physical evidence collected from the dumpsters (Ex. C at 155–70).  She testified that the waistband of shorts recovered from the dumpster of the Shell station contained a mixture of DNA, with the major contributor matching Petitioner.  The crotch area also contained a mixture, with the major profile matching Kendall Rogers.  The major contributor to DNA on the white and pink female shorts was Kendall; the other contributor was Petitioner.  Two swabs from the red comforter matched Kendall.  The swabs were taken at areas that indicated saliva or skin cells; there was no

indication of blood on the comforter.  Ms. Hatler testified that clippings from Kendall's fingernails matched Petitioner at five genetic markers.

Deputy Leonard Tyree testified that he made contact with Petitioner at an apartment on June 24, 2008, at approximately 6:15 p.m., and Petitioner agreed to go to the sheriff's office with him (Ex. C at 171–83).  Deputy Tyree testified he informed Petitioner of his <u>Miranda</u> rights and then questioned him for two hours.  Deputy Tyree testified that Petitioner said he had last seen Kendall at 7:45 p.m. the day before (June 23).  Petitioner stated Kendall had run out of gas driving her truck, so he had given her his car.  Petitioner stated he put gas in Kendall's truck, then went to Arety's Angels, exchanged keys with Kendall, and left in his car.  Petitioner told Deputy Tyree that Kendall was supposed to get home around 4:00 a.m., but she never came home.  He told Deputy Tyree that he and Kendall had been arguing over the weekend because he had reported her to the state child protective services agency.  He told Deputy Tyree that he thought Kendall was leaving him.  He stated he hated the fact that she worked at Arety's, and he was jealous.  Petitioner also admitted he had anger issues.  He told Deputy Tyree that he and Kendall argued a lot, but they always got back together afterward.  Petitioner told Deputy Tyree that on June 24th, he spent the morning with his child at D'Aundra Evans's sister's apartment, and then he and Evans went to his (Petitioner's) grandparents' house, where they rode four-wheelers.  Petitioner denied that he went to Alabama, and when Deputy Tyree told Petitioner what Evans had reported, Petitioner denied any involvement in Kendall's death.  Petitioner told Deputy Tyree that he wanted to be with Kendall forever.  Deputy Tyree testified that Petitioner's fingernails were long.  He testified that Petitioner was released that day (June 24) and turned himself in on June 26 (Ex. D at 187).

Dr. Broussard, the medical examiner, conducted an autopsy of Kendall's body at 3:00 p.m. on June 25.  Dr. Broussard testified that Kendall was 22 years old, 5'6" tall, and weighed 136 pounds (Ex. D at 193–220).  He testified she had a bruise and an abrasion to her right eye and a small abrasion on the center of her nose.  There also was a deep contusion on her inner lower lip and an abrasion across the bottom of her lip on the outside, an injury consistent with blunt force.  Dr. Broussard testified that either Kendall's face was hit or it hit something.  He testified there was a small abrasion on Kendall's left cheek.  He testified there were linear abrasions on the left side of her neck, consistent with being caused by fingernails.  He testified there was a bruise to her lower

left jaw.  Dr. Broussard testified there were deeper abrasions on the anterior surface of Kendall's neck, caused by something rubbing against the skin.  He testified that a ligature could cause that type of injury, but ligatures typically did not leave the damages on the internal neck that he found in Kendall's neck.  Dr. Broussard testified there was an abrasion on Kendall's right shoulder, a contusion on her left underarm, and abrasions to her left forearm and the back of her left hand.  He testified there also was bruising under her scalp consistent with blunt force trauma, but no fractures or no brain injuries that would explain her death.  Dr. Broussard testified that the most significant injuries were those in Kendall's neck, which included extensive hemorrhage and trauma deep into the neck musculature.  He testified that Kendall's neck injury was one of the most extensive amounts of actual hemorrhage into the neck muscles that he had ever seen.  He testified that bruising in the muscles of the anterior neck was extensive in both sides of Kendall's neck.  Dr Broussard testified that the most likely cause of the bruising was significant manual strangulation.  He testified that the cause of Kendall's death was homicidal violence, including blunt force head and neck trauma.  He testified that the neck injuries were lethal.  Dr. Broussard testified there was no evidence that Kendall was still alive when she was buried.  He testified that when a person is strangled, he or she loses consciousness in as little as ten seconds, or longer if there is a struggle, and it may take up to one minute for death to occur.  Dr. Broussard testified that Kendall's injuries were consistent with a struggle.  Dr. Broussard estimated the time of Kendall's death as 36 hours before the autopsy, give or take 12 hours (meaning, sometime between 3:00 p.m. on June 23 to 3:00 p.m. on June 24).  He testified that some of Kendall's injuries may have been caused when her body was placed in the truck or on the four-wheeler, though not the neck or mouth trauma.

The State rested, and the defense moved for judgment of acquittal on the ground that the State had failed to prove premeditation (Ex. D at 220–22).  The trial court denied the motion (*id.*).

During closing argument, defense counsel argued that the State failed to prove that Petitioner consciously decided to kill Kendall Rogers prior to killing her as required to support a conviction for first degree murder (Ex. D at 243–49).  Defense counsel argued that the State likewise failed to prove the "ill will, hatred, spite, or evil intent" element of second degree murder.  Counsel argued

that the State had only proven the elements of manslaughter, and asked the jury to return a verdict of guilty as to that lesser included offense (*id.*).

The jury returned a verdict of guilty as charged (*id.* at 274). The court proceeded immediately to sentencing. Petitioner told the court the following:

> I just want to say I'm sorry that it happened. I never meant for it to happen. I wish I could go back and prevent this whole situation. I care for her dearly and I never wanted this to happen. It wasn't planned. I just freaked out and did I guess [sic] some people call the police, some people do something different. I just chose to try to hide it and that is why I did what I did.

(Ex. D at 279).

On direct appeal, Petitioner argued that Dr. Turner's testimony was admissible under Florida law, because it was evidence of a commonly understood physiologic condition beyond Petitioner's control, as opposed to evidence of diminished capacity or general mental impairment (Ex. E). Petitioner argued that Dr. Turner's testimony was relevant to the issue of premeditation, and its exclusion denied him his right to present a defense. He cited Chestnut v. State, 538 So. 2d 820 (Fla. 1989), in which the Florida Supreme Court upheld the exclusion of evidence that the defendant suffered from a posttraumatic seizure disorder caused by brain damage from a head injury, to establish that he lacked the requisite mental state for premeditated murder. In Chestnut, the state supreme court indicated in dicta that evidence of mental deficiency or psychiatric impairment is too misleading to be allowed in the guilt phase, because psychiatric conditions demand a sophistication that jurors ordinarily have not developed; however, evidence of commonly understood conditions that are beyond one's control, such as epilepsy, age (i.e., infancy and senility), and intoxication may be admissible.[9] 538 So. 2d at 823. Petitioner also cited Bunney v. State, 603 So. 2d 1270 (Fla.

---

[9] Chestnut was decided prior to 1999, when the Florida Legislature enacted Florida Statutes § 775.051, which provides:

> **Voluntary intoxication; not a defense; evidence not admissible for certain purposes; exception.**
> Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense, except when the consumption, injection, or use of a controlled substance under chapter 893 was pursuant to a lawful prescription issued to the defendant by a practitioner as defined in s. 893.02.

1992), in which the Florida Supreme Court held that evidence of a defendant's epileptic condition was admissible, because it was a commonly understood condition beyond one's control. *Id.* at 1273. Petitioner additionally cited <u>Dilbeck v. State</u>, 643 So. 2d 1027 (Fla. 1994), in which the Florida Supreme Court held that evidence of alcohol-related brain damage (fetal alcohol effect), caused by the defendant's mother's alcohol consumption during pregnancy, was admissible to show lack of capacity to form the specific intent to commit the crime. *Id.* at 1029. Finally, Petitioner cited the First DCA's decision in <u>Wise v. State</u>, 580 So. 2d 329 (Fla. 1st DCA 1991), in which the court held that expert testimony that the defendant was suffering an epileptic seizure which may have caused him to black out at the time of the crime was admissible, because it was evidence of a purely physical condition, not a mental illness or a psychiatric condition, which affected consciousness or prevented the defendant from forming the specific intent to commit the crime.

The First DCA affirmed Petitioner's conviction without explanation (Ex. G). "[T]he summary nature of a state court's decision does not lessen the deference that it is due." <u>Wright v. Moore</u>, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* <u>Harrington</u>, 131 S. Ct. at 784–85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See* <u>Harrington</u>, 131 S. Ct. at 784. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

---

§ 775.051, Fla. Stat. (1999).

Case No.:  3:13cv519/LAC/EMT

Here, Dr. Turner's report stated that Petitioner exhibited "mild symptoms" of organic brain impairment resulting from suffering hydrocephalus as a child, and that his problems controlling his anger and exhibiting impulsive behaviors were consistent with organic brain impairment.  The report further stated that Petitioner suffered from "mild" cognitive deficits, including mild deficits with visual memory as well as some mild impairment with verbal memory to a lesser degree than his visual memory deficits, which were mild but compromised his ability to effectively modulate his emotions, control impulsive behavior, and carefully consider his options when confronted with an emotionally charged situation.  Dr. Turner stated that it was likely that Petitioner's brain impairment was a "contributing factor" in the killing of Kendall Rogers.  Dr. Turner's report did not indicate that Petitioner lacked the capacity to form a premeditated intent, or that his mild symptoms of organic brain impairment prevented him from forming a premeditated intent or affected his consciousness. Instead, his report indicated that Petitioner's brain impairment diminished his ability to control his emotions and behavior.  However, irresistible impulse and diminished capacity are not valid defenses in Florida.  *See* Morgan v. State, 639 So. 2d 6 (Fla. 1994) (irresistible impulse); Evans v. State, 946 So. 2d 1 (Fla. 2006) (holding that trial counsel was not ineffective for failing to present evidence that the defendant suffered from a head injury which led to a deficiency in impulse control, which, in turn, led to the defendant's inability to control his rage and violent behavior, because such evidence was evidence of diminished capacity, which was not a viable defense in Florida).

Petitioner has failed to demonstrate that no fairminded jurist could think that Crane, Holmes, Rock, Chambers, Washington, or any decision of the Supreme Court clearly establishes that the First DCA's application of Florida law in this case was inconsistent with the Constitution.  Therefore, he is not entitled to federal habeas relief on Ground One.

> **B.**    Ground Two: "Appellant [sic] was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel requested a continuance for appellant's [sic] trial."

Petitioner asserts defense counsel Harry Stopp represented him prior to the State's upgrading the charge from second degree murder to first degree murder (doc. 1 at 16–17).  He alleges at a pre-trial hearing on October 23, 2008, Attorney Stopp requested a continuance without Petitioner's consent (*id.*).  Petitioner alleges Stopp claimed that the reasons for his request were that there was

"a lot of material" in the case, and that the State was contemplating upgrading the charge (*id.*). Petitioner alleges prior to this hearing, he told counsel he was ready to go to trial, and he believed that the odds were in his favor because the State was unable to locate witness D'Aundra Evans (*id.*). He alleges if counsel had proceeded with the scheduled trial date of November 3, 2008, instead of requesting a continuance, Petitioner would have been tried for second degree murder, and the outcome of his trial would have been different (*id.*).

Respondent concedes Petitioner presented this claim in his Rule 3.850 motion (doc. 21 at 12). Respondent contends the state court's adjudication of this claim was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 12–13).

> 1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on

ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial,

not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his second amended Rule 3.850 motion (Ex. I at 35–36).  In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (Ex. J at 97–98).  The court adjudicated the claim as follows:

**Ground one:  Continuance**[FN 3]

Defendant contends that his counsel was ineffective for requesting a continuance.  Defendant avers that counsel never stated he needed a continuance; rather, he intimated he was requesting the continuance on behalf of the State.  Defendant asserts that but for counsel's request, the State would not have had enough time to take the case before the Grand Jury.  Consequently, the State would have had to try him on second-degree rather than first-degree murder.

[FN3:  The Court notes that this ground refers to Attorney George Harry Stopp, who eventually withdrew from Defendant's case.  All of the other grounds refer to Attorney Kelly Richards.]

This allegation is insufficiently alleged.  Defendant does not contend that, had his counsel not moved for a continuance, the State could not simply have requested, and obtained, a continuance from the Court, giving the prosecutor sufficient time to take the case before the Grand Jury.  Furthermore, in context, the record indicates that Attorney Stopp was concerned about the large amount of testimony and evidence he would have to process in preparing for the case.[FN4]  As an officer of the court, Attorney Stopp had an ethical obligation not to announce ready for trial unless he truly was ready.[FN 5]  The Court does not find Attorney Stopp's decision to request a continuance in order to deal with the large amount of material involved in the case to be unreasonable.  This allegation does not entitle Defendant to relief.[FN 6]

[FN 4:  *See* Defendant's Exhibit A.]

[FN 5:  "An assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Rule Regulating the Florida Bar § 4-33 cmt. (2010) (Representations by a Lawyer).]

[FN 6:  Defendant has been given leave to amend.  *See* Attachment 2, order.]

(Ex. J at 98–99).  Petitioner presented argument on this claim in his initial brief to the First DCA (Ex. K at 9).  The First DCA affirmed the lower court's decision without written opinion (Ex. M).

The record supports the state court's factual finding that Attorney Stopp was concerned about the large amount of testimony and evidence he would have to process in preparing the case for trial. Petitioner attached to his Rule 3.850 motion a transcript of the pre-trial proceeding held on October 23, 2008 (Ex. I at 157–60).  The transcript reflects the following:

MR. STOPP:  . . . [T]his is our first time up.  We are asking for a two-cycle continuance, if we could.  There is a lot of material in this particular case and I've spoken with Ms. Neel [the prosecutor], and she's potentially doing—she's doing some other research on it to see if, in fact, it's going to go to the grand jury or not. I'd like to have a two-cycle up front.

THE COURT:  What does the grand jury—

MS. NEEL:  I might make it first [degree murder].  I don't know.  I'm still trying—

THE COURT:  Oh, you might try to upgrade it.

MS. NEEL:  Yes.

THE COURT:  Well, two times would be February the 26th docket day and March the 9th for the trial week.

MR. STOPP:  That's fine, Your Honor.
. . . .
MS. NEEL:  Your Honor, we also filed a motion to compel.  It's my understanding that they're not objecting to that.

THE COURT:  Compel what?  Buccal swabs?

            MS. NEEL:  Fingerprints, photographs, and buccal swabs.

. . . .

            MS. NEEL:  And palm prints.

            MR. STOPP:  And we have no objection, Your Honor.

. . . .

            THE COURT:  Docket day is February the 26th.  The trial week is March the 9th.

(Ex. I at 157–60).

The state court's determination that Attorney Stopp's performance was not deficient was reasonable.  At the time Attorney Stopp requested the continuance (October 2008) he had been representing Petitioner for only two months and, according to Stopp, the case involved a large volume of discovery material.[10]  Additionally, three days prior to Stopp's request for a continuance, the State filed a motion to compel Petitioner to permit the taking of buccal swabs, a photograph, fingerprints and palm prints, to be tested by its experts (Ex. A at 31–32).  Defense counsel would reasonably believe that this would generate even more discovery material necessitating review and possible investigation prior to trial.

Petitioner failed to demonstrate that the state court made an unreasonable factual finding or unreasonably applied Strickland in denying this claim.  Therefore, he is not entitled to relief on Ground Two.

        C.     Ground Three:  "Appellant [sic] was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to file a notice of expiration of speedy trial time."

Petitioner contends defense counsel was ineffective for not filing a notice of expiration of speedy trial time when 175 days from the date of Petitioner's arrest (June 26, 2008) had elapsed (doc. 1 at 17–19).  He acknowledges that prior to expiration of the 175-day period, defense counsel sought and was granted a continuance, but he contends he did not consent to defense counsel's request for a continuance, and that the continuance should have been charged to the State, because the reason for it was to permit the State to pursue upgrading the charge (id.).  Petitioner asserts if

---

[10] The record reflects that Attorney Stopp, who was regional conflict counsel ("RCC"), was appointed to represent Petitioner on August 18, 2008 (Ex. A, Docket Sheet).

defense counsel had filed a notice of expiration of speedy trial, he would have been tried for only second degree murder, or he would have been discharged (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 14). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 14–15).

1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his second amended Rule 3.850 motion (Ex. I at 36–38). The state circuit court adjudicated the claim as follows:

**Ground two:  Expiration of Speedy Trial**

Defendant contends that counsel should have filed a notice of expiration of speedy trial. Had counsel done so, the "recapture period" would have been activated, and the State would not have been able to take Defendant to trial on first-degree murder within the allotted 15 days. Defendant avers that the State would have had to either try him for second-degree murder or discharge him.

Had counsel filed a notice of expiration of speedy trial, the Court would have held a hearing pursuant to Rule 3.191(p)(3), which states:

No later than 5 days from the date of the filing of a notice of expiration of speedy trial time, the court shall hold a hearing on the notice and, unless the court finds that one of the reasons set forth in subdivision (j) exists, shall order that the defendant be brought to trial within 10 days.

The reasons in subdivision (j) include whether "the failure to hold trial is attributable to the accused." Rule 3.191(j)(2). As noted above, prior defense counsel had requested a continuance. Therefore, the Court would not have ordered that the trial go forward within 10 days because the delay was attributable to the defense. However, the trial would have had to have been scheduled within 90 days of the denial pursuant to Rule 3.191(p). Defendant states that counsel was appointed in "early January" 2009. The indictment was handed down on February 3, 2009, well within the 90-day window. Defendant has therefore not shown that he was prejudiced by his counsel's failure to file such a motion.

(Ex. J at 99–100).  Petitioner presented argument on this claim in his initial brief to the First DCA (Ex. K at 9).  The First DCA affirmed the lower court's decision (Ex. M).

This court must abide by the state court's interpretation of state law.  *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).  Therefore, this court is bound by the state court's determination that under Rule 3.191 of the Florida Rules of Criminal Procedure, Petitioner still would have faced the first-degree murder charge even if defense counsel had filed a notice of expiration of speedy trial on December 18, 2008 (upon expiration of the 175-day speedy trial period), because Rule 3.191 provides 5 days for the court to hold a hearing on the notice, and the court would not have required trial to commence until March 18, 2009 at the earliest (assuming the court held the hearing the day after counsel filed the notice, and adding 90 days to that date).  As the state court found, the grand jury returned the indictment on February 3, 2009.  Therefore, defense counsel's filing a notice of expiration of speedy trial would not have resulted in Petitioner's being tried for second degree murder or discharged.

Petitioner failed to demonstrate that the state court made an unreasonable factual finding or unreasonably applied Strickland in denying this claim.  Therefore, he is not entitled to relief on Ground Three.

    D.     Ground Four:  "Appellent [sic] was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel filed a motion for judgement [sic] of acquiatal [sic] and gave boilerplate areguement [sic] dealing with the State's insuffcent [sic] case."

Petitioner contends defense counsel insufficiently argued the motion for judgment of acquittal ("JOA") (doc. 1 at 19–21).  He contends counsel should have made the following arguments with respect to the State's failure to prove premeditation:  (1) Petitioner's conduct after the killing, such as transporting and burying the body and discarding particular items, was irrelevant to the issue of premeditation, because that conduct occurred after the killing; (2) the State failed to present eyewitness testimony of the actual killing; (3) the State failed to present evidence that Petitioner threatened to harm Kendall Rogers; (4) Dr. Broussard testified that most of Kendall's injuries occurred post-mortem during transportation and burial of her body, and some of her injuries occurred peri-mortem, as Kendall was dying or immediately thereafter; (5) Dr. Broussard admitted

he could not determine when the peri-mortem injuries occurred; (6) D'Aundra Evans testified he did not see any signs of a struggle or blood in the apartment; (7) Detective Tyree testified that he did not see any injuries on Petitioner during his interview; and (8) Jennifer Hatler, the crime lab analyst, testified that she found no indication of blood on the comforter (*id.*).  Petitioner argues if counsel had included these arguments in her motion for JOA, there is a strong probability the court would have granted it (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 15).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 15–16).

        1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his second amended Rule 3.850 motion (Ex. I at 39–41).  The state circuit court adjudicated the claim as follows:

**Ground three:  Motion for Judgment of Acquittal**

Defendant argues that his counsel made an insufficient argument with regard to the motion for judgment of acquittal.  Defendant alleges that counsel should have argued facts to bolster her argument in order to "preserve [the issue] properly for appellate review."

"A motion for judgment of acquittal should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law."  *Patrick v. State*, [104 So. 3d 1046, 1063 (Fla. 2012)].

Although the facts of the killing are undisputed, reasonable people's opinions could differ as to Defendant's frame of mind during the incident.  The facts could support Defendant's contention that he flew into a rage and could not control himself. Conversely, the facts could support the State's contention that Defendant had a premeditated intent to kill the victim.[FN 7]  Even had counsel made a more eloquent motion for judgment of acquittal on this point, the motion would have been properly denied because the evidence was sufficient to present a question for the

jury. Defendant has not shown that counsel's argument for a judgment of acquittal prejudiced Defendant.  This claim does not entitle Defendant to relief.

> [*See* Attachment 1, excerpt from trial transcript, at 235–43 and 249–59 (State's closing argument and rebuttal).]

(Ex. J at 100–01).  Petitioner presented argument on this claim in his initial brief to the First DCA (Ex. K at 20–23).  The First DCA affirmed the lower court's decision without written opinion (Ex. M).

The trial transcript demonstrates that at the close of the State's case, defense counsel made a motion for JOA and argued that the State failed to present any evidence of premeditation (Ex. D at 220–22).  She argued there was no evidence that prior to the killing Petitioner had the opportunity to consciously reflect, and that he did so (*id.*).  Counsel also argued that Dr. Broussard's testimony indicated that the cause of death was more likely blunt force trauma, which was less suggestive of premeditation than strangulation (*id.*).

The state court reasonably found, based upon the evidence adduced at trial as set forth *supra*, that a reasonable person could view the evidence as supporting the defense's position that Petitioner flew into a rage and could not control himself, but a reasonable person could also view the evidence as supporting the State's position that Petitioner had a premeditated intent to kill the victim.  Given the state court's statement of Florida's legal standard applicable to a motion for JOA (that a motion for JOA should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law), which is a determination to which this federal court must defer, Petitioner failed to show a reasonable probability that the trial court would have granted the motion for JOA had defense counsel made the arguments that Petitioner faults her for not making.

Petitioner failed to demonstrate that the state court made an unreasonable factual finding or unreasonably applied Strickland in denying this claim.  Therefore, he is not entitled to relief on Ground Four.

E.      Ground Six:[11]  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel entirely failed to raise an insanity defense."

Petitioner contends defense counsel should have raised an insanity defense (doc. 1 at 23–24). He alleges counsel was aware, from Dr. Turner's report, that he suffers from an organic brain impairment which compromises his ability to effectively modulate his emotions, control impulsive behavior, and carefully consider his options when confronted with an emotionally charged situation (*id.*). He alleges counsel was also aware of Dr. Turner's opinion that Petitioner's impairment was a contributing factor in the killing (*id.*). Petitioner alleges counsel was additionally aware that throughout his childhood, he suffered from "memory loss or 'black outs'" during which he did not remember certain events (*id.* at 23). He alleges his mother, Jodie Plano, would have testified that he was "prone to 'black outs'" (*id.* at 23–24). He alleges he himself would have testified that he and Kendall Rogers were involved in a very intense and emotional argument regarding their relationship (*id.* at 24). He alleges Kendall told him that she was romantically involved with someone else and no longer wanted to be involved with him (Petitioner) (*id.*). He alleges, "Russell's mind went into a clouded frenzy; he grabbed the victim by the throat pushing her back causing her head to crash against the wall. The next thing Russell remembers is the victim lying on the ground and he is standing over her." (*id.*). Petitioner alleges he explained to counsel that he did not remember anything that occurred after he initially grabbed the victim (*id.*). He alleges counsel should have presented an insanity defense by presenting testimony from him, his mother, and Dr. Turner (*id.*). He alleges if counsel had done so, he possibly would have been convicted of a lesser included offense or acquitted (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 18). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 18–20).

---

[11] Petitioner's Ground Five is a claim that the cumulative effect of defense counsel's errors deprived him of a fair trial (*see* doc. 1 at 21–22). The court will first consider Petitioner's claims of individual errors allegedly committed by counsel (asserted in Grounds Two through Four, *supra*, and Grounds Six through Seventeen, *infra*), and then address Ground Five as Petitioner's final claim.

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his second amended Rule 3.850 motion (Ex. I at 43–45).  The state circuit court adjudicated the claim as follows:

**Ground five:  Insanity Defense**

Defendant alleges that counsel was ineffective for failing to raise the defense of insanity.  Defendant argues that he has organic brain impairment, compromising his ability to "control impulsive behavior and carefully consider his options when confronted with an emotionally charged situation."  Defendant adds that he is prone to "blackouts" that make it impossible to remember certain events.

Counsel did try to raise a mental health defense,[FN 8] but the State filed a motion in limine to block its use.[FN 9]  A hearing was held on September 16, 2009.  The Court granted the motion *in limine*.[FN 10]  Counsel was not deficient for failing to present a defense that the Court disallowed.

[FN 8:  *See* Attachment 3, motion.]
[FN 9:  *See* Attachment 4, motion in limine.]
[FN 10:  *See* Attachment 5, transcript of motion hearing.]

Furthermore, in Florida, a defendant may be found criminally insane if "he or she commits an unlawful act, but by reason of a mental infirmity, disease, or defect is unable to understand the nature and quality of his or her act, or its consequences, or is incapable of distinguishing right from wrong at tile time of the incident."  *Patton v. State*, 878 So. 2d 368, 375 (Fla. 2004).  Simply establishing a mental disease or defect, standing alone, is not sufficient.  *See Owen v, State*, 986 So. 2d 534, 546 (Fla. 2008) (indicating that "[b]oth aspects of the insanity defense must be addressed.  Expert testimony that a defendant suffered from a mental infirmity, disease, or defect without concluding that as a result the defendant could not distinguish right from wrong is irrelevant").

Defendant does not allege that he was unaware of the quality or nature of his actions or that he was unaware that his actions were wrong.  On the contrary, it is clear that Defendant did understand the quality or nature of his actions as he admits in his motion that he knew he had grabbed the victim by the throat and pushed her up against the wall.[FN 11]  Although he states he does not remember the entirety of the altercation, such an allegation does not meet the requirements for an insanity defense.  Because Defendant alleges only a mental defect, he has shown no

entitlement to an insanity defense; thus he has not shown any deficiency on the part of his counsel or any prejudice to his defense.  This allegation cannot entitle Defendant to relief.

> [FN 11:  Additionally, in ground six, Defendant states he did not wish "to severely hurt" the victim.  *See* motion at page 15.  Therefore, Defendant knew he was hurting the victim.  Also, he wished to cause the victim pain.  Such an allegation is inconsistent with an assertion that Defendant did not know that what he was doing was wrong.]

(Ex. J at 101–03).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 26–28).  The First DCA affirmed without written opinion (Ex. M).

The state court's decision rested upon the determination that under Florida law, Petitioner's allegation of organic brain impairment, standing alone, did not establish a valid insanity defense.[12] Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of Strickland, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law."  Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)

---

[12] Florida law provides:

**(1) Affirmative defense.**—All persons are presumed to be sane. It is an affirmative defense to a criminal prosecution that, at the time of the commission of the acts constituting the offense, the defendant was insane. Insanity is established when:

(a) The defendant had a mental infirmity, disease, or defect; and

(b) Because of this condition, the defendant:

1. Did not know what he or she was doing or its consequences; or

2. Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

Mental infirmity, disease, or defect does not constitute a defense of insanity except as provided in this subsection.

Fla. Stat. § 775.027(1) (eff. 2000).  Diminished capacity is not a valid defense, and evidence of a defendant's diminished capacity is inadmissible at trial on the issue of criminal intent.  *See* Chestnut v. State, 538 So. 2d 820 (Fla.1989) (holding that diminished capacity is not a viable defense); Hodges v. State, 885 So. 2d 338, 352 n. 8 (Fla. 2004) ("This Court has held on numerous occasions that evidence of an abnormal mental condition not constituting legal insanity is inadmissible to negate specific intent."); State v. Bias, 653 So. 2d 380, 382 (Fla.1995) ("We continue to adhere to the rule that expert evidence of diminished capacity is inadmissible on the issue of mens rea.").

(explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted);[13] *see also* Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, as in Alvord, Callahan, and Herring, the state court has already answered the question of whether Petitioner's organic brain impairment would have provided a viable insanity defense—it would not have. This court must defer to the state court's determination of state law. Counsel's failure to present a defense based on Petitioner's organic brain impairment cannot be deemed deficient performance, and Petitioner cannot show she was prejudiced by counsel's failure to pursue this defense, because it had no arguable basis for success.

---

[13] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 F. App'x 806 (11th Cir. 2007).

The state court's rejection of Petitioner's ineffective assistance claim did not result in a decision that was "contrary to, or involved an unreasonable application of" <u>Strickland</u>. Therefore, Petitioner is not entitled to federal habeas relief on Ground Six.

      F.    <u>Ground Seven: "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel entirely failed to raise the defense of 'heat of passion.'"</u>

Petitioner alleges defense counsel was aware that Savannah Hane was available to testify, and had knowledge that Petitioner cared deeply for Kendall Rogers and that Kendall wanted to end her relationship with Petitioner (doc. 1 at 24–26). He alleges D'Aundra Evans "assumed" that Kendal wanted to break-up with Petitioner (*id.* at 25). Petitioner alleges Christina Herr, who was also available to testify, knew that Kendall did not want to have a relationship with Petitioner any longer (*id.*). Petitioner alleges he even told Deputy Tyree how much he loved Kendall, and that he discovered she was cheating on him, had stayed out all night on different occasions, and wanted to leave him (*id.*). He alleges he told counsel that he wished to testify to the events leading up to the killing and what he could remember of the killing itself (*id.*). He alleges he would have testified that he and Kendall began to argue, and as the argument escalated, she told him she was involved with someone else, that she was tired of being with Petitioner, and that their relationship was over (*id.*). Petitioner alleges he would have testified that "[his] mind was clouded with various emotions and before he knew it her [sic] grabbed the victim by the throat pushing her back causing the back of her head to hit the wall[,] not wanting to hurt her but not able to control his actions." (*id.*). Petitioner alleges the next thing he remembers is standing over the victim as she was lying on the ground (*id.* at 25–26). Petitioner alleges defense counsel should have presented this evidence in support of a "heat of passion" defense (*id.* at 24–26). He alleges if counsel had presented this defense, he would have been convicted of a lesser included offense or possibly been acquitted (*id.* at 26).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 20). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 20–22).

      1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.     Federal Review of State Court Decision

Petitioner raised this claim as Ground Six in his second amended Rule 3.850 motion (Ex. I at 45–48).  The state circuit court adjudicated the claim as follows:

**Ground six:  Heat-of-Passion Defense**

Defendant claims that counsel should have asserted a "Heat of Passion" defense on his behalf.  Defendant alleges that several witnesses could have testified to his deep love for the victim and her plans to leave him.  Defendant alleges that during the incident, he and the victim argued, and she informed him that their relationship was over.  He alleges that his mind became "clouded with various emotions," causing him to lose control of his actions, and leading to the victim's death.

A heat-of-passion defense involves showing that "[a] sudden transport of passion, caused by adequate provocation, [suspended] the exercise of judgment, and dominate[d] volition, so as to exclude premeditation and a previously formed design . . . ."  *Villella v. State*, 833 So. 2d 192, 195 (Fla. 5th DCA 2002).  In this case, the facts do not support a heat-of-passion defense.

Defendant's motion, as well as his attachments, indicates that Defendant knew at least several days before the victim's death that the victim wished to leave him.  On page 17 of his motion, Defendant states that he had told Brittany Richardson he "thought [the victim] was cheating on him and would not stop, but did not want to be without her."

Also, in the excerpt from Savannah Hane's statement, Hane said the victim told her "HRS got involved.  They got me away from him."  On the Friday night before the killing, the victim also told Hane that she had been staying "here there and everywhere" and staying with friends.  Hane stated that at one point "a week before all this happened," Defendant had called the victim while she was with friends.  The friends got on the telephone and informed Defendant, "You need to leave her alone, she's done with you."[FN 12]

[FN 12:  *See* Defendant's exhibit marked "A-3."]

Hane further indicated that the victim told her that "HRS" had given the victim "an ultimatum, it's either Rick or Cadence [sic]."  The victim told Hane, "I chose my daughter . . . she has to stay [with my mom] until I get away from Rick."[FN 13]  During his police interview, Defendant indicated that he had called

HRS on "Saturday" and that "the HRS lady came on Monday."[FN 14]  The victim
was slain on Tuesday.[FN 15]

> [FN 13: *See* Defendant's exhibit marked "A-3."]
>
> [FN 14: *See* Defendant's exhibit marked "D-3."]
>
> [FN 15: *See* Defendant's exhibits marked "E-3" and "F-3l." *See also* "A-5."]

> Christina Herr stated that she had witnessed part of a fight between
> Defendant and the victim and that the victim had clearly told Defendant that she was
> going to leave him.[FN 16]  All of these details show that the fact that the victim was
> planning to leave Defendant was not a sudden revelation to him on the day of the
> murder.  Had counsel adduced such evidence, the State could easily have argued that
> Defendant had known about the victim's plan to leave him and had planned to kill
> her because of it, effectively supporting the State's theory of premeditation.
> Defendant cannot show that counsel was deficient for failing to advance a defense
> that would not have been meritorious and could very well have done more harm than
> good.  This allegation cannot entitle Defendant to relief.

(Ex. J at 103–04).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 29–32).  The First DCA affirmed without written opinion (Ex. M).

As with Petitioner's previous claim, this court must defer to the state court's determination that the evidence proffered by Petitioner would not have supported a meritorious defense under Florida law.  Further, the state court reasonably concluded that Petitioner's proffered evidence could have damaged his lack-of-premeditation defense.  For these reasons, the state court's adjudication of Petitioner's claim was not an unreasonable application of Strickland.  Accordingly, Petitioner is not entitled to federal habeas relief on Ground Seven.

G.   Ground Eight:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to call various witnesses."

Petitioner alleges defense counsel was ineffective for failing to present testimony from four witnesses in support of a "heat of passion" and insanity defense (doc. 1 at 26–27).  He alleges if counsel had called the following witnesses, their testimony would have established a viable defense, and the outcome of his trial would have been different (*id.*).

Petitioner alleges Brittany Richardson was available to testify at trial and would have testified that prior to the killing, she found numerous letters addressed to Kendall Rogers from Rogers's ex-boyfriend, and Ms. Richardson told Petitioner about the letters (doc. 1 at 26). Petitioner alleges Ms. Richardson would have testified that Petitioner "vented his emotions" to her, telling her that he loved Kendall very much, he believed she was cheating on him and would not stop, but he did not want to be without her (*id.*). He alleges Ms. Richardson would have testified that after this "vent," Petitioner was "very distraught," and did not know what to do (*id.*).

Petitioner alleges the second witness who was available to testify for the defense was his mother, Jodie Plato (doc. 1 at 26). He alleges Ms. Plato would have testified that for many months preceding the killing, Petitioner told her, and she observed, that Petitioner was madly in love with Kendall (*id.*). He alleges she would have testified that even though Petitioner and Kendall argued, Petitioner's feelings were so strong for her that he thought he could handle any problems they had (*id.* at 26–27). Petitioner alleges his mother also would have testified that Petitioner experienced blackouts throughout his life (*id.* at 27).

Petitioner alleges the third witness who was available to testify for the defense was Savannah Hane (doc. 1 at 27). He alleges Ms. Hane would have testified that she observed Petitioner and Kendall on several occasions, and believed that Petitioner "wanted to be by her side" (*id.*). He alleges Ms. Hane also would have testified that on two separate occasions shortly before the killing, Kendall told her that she did not want to be with Petitioner and was planning to leave him (*id.*).

Petitioner alleges the fourth witness who was available to testify for the defense was his grandmother, Betty Jo Russell (doc. 1 at 27). He alleges his grandmother would have testified that during her encounters with Petitioner and Kendall, she observed "affection only a real love could exhibit," even though Petitioner vented to her about his arguments with Kendall (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 22). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 22–24).

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Seven in his second amended Rule 3.850 motion (Ex. I at 48–50).  Petitioner attached a transcript of a recorded statement of Savannah Hane (*id*. at 72–77).  When asked about her observations of Petitioner and Kendall's relationship before they dated, Ms. Hane stated:

> A.      At first they, I mean he was like right there.  You know, he wanted to be everywhere she was.  If she was in the restroom say straightening her hair or putting on her makeup, he was right there with her.  You know, I mean they spent so much time together, they seemed like they got along really well.  Now, with him and his girlfriend, that's a whole different story, like he would yell (unintelligible) over the phone and things like that.  But with Kendall it was so, it was totally different like . . .

> Q.      Okay, so you would hear him yell at Monique [Petitioner's girlfriend at the time] over the phone?

> A.      Oh, yeah.  Oh, yeah.

(Ex. J at 73).  Ms. Hane stated that Kendall called her on June 15, 2008 (nine days before the killing), and told her that the child protective services agency had removed her daughter from her custody and placed her with her (Kendall's) mother (*id.* at 74).  Hane stated that Kendall told her that the agency "gave her an ultimatum, it's either Rick or Cadence [sic]," and that Kaydence was staying with Kendall's mother "until I get away from Rick." (*id.*).  Ms. Hane stated that Kendall indicated she was trying to get away from Petitioner and was "staying here and there and everywhere" (*id.* at 75).  Hane stated that Kendall told her, "Everything is getting better now . . . I'm away from him." (*id.*).  Ms. Hane stated she spoke with Kendall again, just four days before she was killed (*id.*).  She stated that Kendall repeated that she was trying to get away from Petitioner and was staying here, there, and everywhere (*id.*).

The state circuit court adjudicated Petitioner's claim as follows:

**Ground seven:  Witnesses**

> In this ground, Defendant lists four witnesses that counsel should have called to testify on his behalf.  He indicates that these witnesses would have given testimony to support his heat-of-passion defense.  Defendant alleges that each witness was "available and ready and able to testify," but he does not allege that the

witnesses were available to testify at trial.  Such allegation is not facially sufficient. *See Meus v, State*, 968 So. 2d 706, 710–711 (Fla. 2d DCA 2007) ("It is well settled that in order for a defendant to state a facially sufficient claim for failure to call a witness at trial, the defendant must allege . . . (3) the availability of the witness to testify *at trial*") (emphasis supplied).  Even were Defendant's allegations facially sufficient, however, he would still be entitled to no relief.

First, Defendant alleges that Brittany Richardson would have said that she had seen letters to the victim from the victim's ex-boyfriend; that she "assumed" the victim was cheating and would soon leave Defendant; and that Defendant had told her he loved the victim, thought she was cheating, and did not want to be without the victim.  Defendant has not shown prejudice from the omission of this witness.  The information about the letters was inconsequential without some indication that Defendant, too, had seen or had reason to know about the letters from the ex-boyfriend.  Defendant's state of mind on the day of the murder could not have been affected by letters of which he was unaware.  Moreover, testimony of this witness's "assumption" that the victim was cheating or had plans to leave Defendant would have been merely speculative and not admissible at trial.  Further, Defendant's hearsay statements regarding his relationship with the victim would have been inadmissible, and Defendant has not shown that an exception existed that would have allowed the admission of such testimony.

Defendant alleges that three other witnesses would have assisted his cause: Jodie Plato, Savannah Hane, and Betty Jo Russell.  Defendant alleges that Plato would have said that Defendant was very much in love with the victim and that he felt that their arguments and problems were manageable as long as they stayed together.  Hane would have testified that Defendant had strong feelings for the victim and that the victim had told her she planned to leave Defendant.  Russell would have testified that Defendant and the victim had a "real love" and that Defendant and victim argued with each other.

As with the testimony from Richardson, much of the testimony Defendant alleges would have been available from Plato and Hane would have been inadmissible hearsay.  The balance of the purported testimony from Plato, Hane, and Russell would have been cumulative to testimony already adduced at trial.  D'Aundra Evans testified that Defendant and the victim "fuss[ed] a lot" including physical altercations, but that they would "kiss and make up" after the fight ended.[FN 17]  Police Investigator Leonard Tyree testified that Defendant had said he thought the victim was leaving him, that the two argued a lot, that they "always got back together afterwards," that he was a jealous person, and that he wanted to be with the victim forever.[FN 18]

[FN 17:  *See* Attachment 1 at 102–03.]

[FN 18: *See* Attachment 1 at 173–74 and 182.]

Therefore, Defendant's feelings for the victim, and his fear that she was going to leave the relationship, were made clear to the jury from Defendant's own statements. No one else would have known as well as Defendant did how he truly felt about the victim. Further, the fact that Defendant and the victim had a volatile relationship in which fighting and making up were common was also clear to the jury. Defendant has not, therefore, shown how the testimony of Plato, Hane, or Russell would have been necessary to establish his defense. Consequently, Defendant is not entitled to relief.

(Ex. J at 104–06). Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 32–35). The First DCA affirmed without written opinion (Ex. M).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler, 218 F.3d at 1314 n.14 (11th Cir. 2000) (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do." Id. at 1314–15 n.15. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Petitioner did not proffer to the state court any reliable evidence, in the form of an affidavit or otherwise, that Ms. Richardson, Ms. Plato, or Ms. Russell would have testified as he describes. Petitioner's speculative assertions as to the content of their proposed trial testimony are insufficient to show that defense counsel's failure to present their testimony in support of a "heat of passion" or insanity defense was unreasonable.

Although Petitioner submitted evidence of Ms. Hane's proffered testimony, he failed to show that her testimony would have supported a "heat of passion" defense. As the state court determined with regard to Petitioner's claims of ineffectiveness concerning counsel's failure to present a "heat of passion" defense, a heat-of-passion defense under Florida law required a showing that "[a] sudden

transport of passion, caused by adequate provocation, [suspended] the exercise of judgment, and dominate[d] volition, so as to exclude premeditation and a previously formed design . . . ."  *See* Villella v. State, 833 So. 2d 192, 195 (Fla. 5th DCA 2002).  Ms. Hane's proffered testimony, that in the week before the killing Kendall had been attempting to leave Petitioner and was not staying at the apartment they shared, would have not have supported the theory that on the day of the killing (four days after Ms. Hane's last conversation with Kendall), Petitioner was adequately provoked to the degree that he could not have formed a premeditated intent to kill Kendall.  Indeed, as discussed *supra* in Grounds Six and Seven, the state court determined that Petitioner's proffered evidence would not have supported either a "heat of passion" or insanity defense under Florida law.

Petitioner failed to demonstrate that the state court's adjudication of Ground Eight was based upon an unreasonable determination of fact, or that it was an unreasonable application of Strickland. Therefore, he is not entitled to federal habeas relief.

H.    Ground Nine:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel misadvised Russell regarding use of prior convictions impeachment [sic]."

Petitioner alleges defense counsel advised him that he had been convicted of numerous felonies, and it would be in his best interest not to testify because the State would use his convictions to impeach his credibility (doc. 1 at 28).  He alleges at the beginning of trial, counsel advised him that she was wrong about the actual disposition of his prior criminal charges, and that adjudication had been withheld (*id.*).  He alleges the trial court directed the clerk to verify the status of Petitioner's prior charge(s), and during the first recess of trial, the clerk advised that the court withheld adjudication (*id.*).  Petitioner alleges that upon discovering this information, he told defense counsel that he wished to testify to explain his state of mind during the killing, but defense counsel advised against it, because she had not had an opportunity to prepare him to testify (*id.*).  He alleges throughout trial, he repeatedly told defense counsel he wished to testify (*id.*).  He alleges the trial court inquired of him as to whether he wished to testify, but upon counsel's advising him against it (due to the lack of preparation), he told the trial court he did not wish to testify (*id.*).  Petitioner alleges if he would have testified, he would have explained that he never wanted Kendall to die, that he loved her dearly, and that at the time of the killing, his emotions were "clouded" because Kendall

told him she was involved with someone else and no longer wanted to be with Petitioner (*id.* at 28–29).  Petitioner alleges he also would have explained to the jury that once he grabbed Kendall by the throat and pushed her back against the wall, causing her head to hit it, he only remembers her lying on the ground with him standing over her (*id.* at 29).  Petitioner alleges his testimony would have presented a viable defense that would have resulted in his conviction of a lesser included offense or possibly an acquittal (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 24).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 24–26).

        1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Eight in his second amended Rule 3.850 motion (Ex. I at 50–52).  The state circuit court adjudicated the claim as follows:

**Ground eight:  Prior Convictions**

> Defendant avers that counsel misadvised him regarding his prior convictions. She informed him that his felony convictions could be used to taint his credibility at trial and it would be "in his best interest if he declined to testify at his trial." Because she believed Defendant had prior felonies, counsel failed to prepare him to testify.  When it became obvious that the felonies would not be used against Defendant at trial, he had decided he wanted to testify, but counsel advised against it due to the lack of preparation.  Defendant asserts he would have testified that he did not want the victim to die, that he loved the victim, that his emotions were clouded due to their argument, that he did not want to live without her, and that he did not recall much of the incident.

> The judgment and sentencing documents from these prior convictions had been incorrectly notated to show that Defendant had been adjudicated guilty. Furthermore, a withhold of adjudication would not have been proper and would have resulted in an illegal sentence.  As such, it was not unreasonable for counsel to advise Defendant that his prior convictions could be used against him in cross examination. When the clerk's office investigated the issue, at the Court's request, and determined that adjudication of guilt had been withheld, counsel advised

Defendant as to what she believed to be in his best interest.  Importantly, the Court inquired of Defendant regarding his desire with regard to testifying.  The Court made it very clear that the decision to testify was his and his alone, and although his attorney could offer advice, she could not make the decision for him.  Defendant assured the Court that he understood and it was his choice not to testify.[FN 19]

> [FN 19:  *See* Attachment 1 at 74 and 222–25.]

> Additionally, Defendant does not allege how his testimony would have differed had his attorney prepared him to testify or why he felt that he could not give "his side of the story" without such preparation.  Based upon these facts, the Court finds neither deficiency nor prejudice, and Defendant is not entitled to relief.

(Ex. J at 106–08).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 35–39).  The First DCA affirmed without written opinion (Ex. M).

The the trial transcript shows that prior to the presentation of evidence, defense counsel raised the issue of the court's records containing conflicting information regarding Petitioner's prior convictions:

> MS. RICHARDS:  . . . the State had presented me with a judgment and sentence that shows prior felony convictions, however, Mr. Russell didn't seem to think he had been convicted.

> When I went to the clerk's website, according to what they have typed, their docket, it shows that adjudication was withheld.  There was even a violation of community control where adjudication was continued to be withheld.  And I was thinking perhaps we may need to order that file so we can at least look at it and see if there was a plea agreement or something in there, because the judgment and sentence does show an adjudication of guilt.

> THE COURT:  That's going to make a difference on the number?  . . .

> MS. JENSEN [the prosecutor]: Judge, I think it makes a difference.  It is one of the considerations the defendant is taking into consideration on whether he testifies or not.

> MS. RICHARDS:  It is and it would be, I think perhaps three felony convictions or zero felony convictions, so it does make a difference.

> THE COURT:  She says four.

> MS. RICHARDS:  I think there's just three.

> MS. JENSEN:  It is four.
>
> MS. RICHARDS:  Show me.
>
> (Off the record discussion between counsel)
>
> MS. JENSEN:  Four.
>
> THE COURT:  Well, the State is going to have to be in a position to have certified copies of the conviction if somebody gets on the stand and says zero.
>
> MS. JENSEN:  Judge, the problem is I do have certified judgment and sentences for his prior convictions but they are disputing whether adjudication of guilt was withheld or whether he was adjudicated.
>
> The records show that he was adjudicated guilty, which means they are admissible as far as impeachment.  They are saying it was withheld, which means the State could not use them.
>
> THE COURT:  And that's on a website that you got that information?
>
> MS. RICHARDS:  Yes, there's a discrepancy in the clerk's notes.
>
> THE COURT:  Is it four cases all charged at one time?
>
> MS. JENSEN:  It's one case, four separate counts.
>
> . . . .
>
> THE COURT:  Yeah, we'll get the file.  We'll take a look at it.

(Ex. C at 40–42).  Later, during a bench conference, the trial judge advised the parties that the clerk's office reported that "the judgment [on Petitioner's prior criminal case] was typed up in error, that it [adjudication] was withheld" (Ex. C at 74).

After the State rested its case, defense counsel announced, "I think we're going to rest." (Ex. D at 222).  The trial judge inquired of Petitioner as follows:

> THE COURT:  Okay.  We need to take care of something then if that's what is going to happen.  Mr. Russell, your attorney indicates as soon as we take a break, when we come back, the State has rested, now is your opportunity to present evidence if you want to present evidence.  Your attorney indicates that you're going to rest without presenting any evidence, without you testifying yourself.

Now you can become a witness in the case if you want to. It is your decision. It is 100 percent your decision. Your attorney can give you advice and make recommendations but whether or not you become a witness in the case is your decision, it is not your attorney's decision. Now the State cannot make you become a witness. The State cannot subpoena you like they can other people and make them become witnesses. You have that special constitutional right not to be compelled to offer testimony against yourself so what I hear your attorney say is y'all have had a discussion about the advantages and disadvantages of you becoming a witness in this case and you made, weighing the advantages and disadvantages, you made the decision to not become a witness in the case, is that accurate or inaccurate?

THE DEFENDANT: It is accurate, sir.

THE COURT: And you and Mrs. Richards had that discussion about whether or not you should or should not become a witness in the case and testify?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you understand it is 100 percent your decision to make as to whether or not you wish to be a witness in the case?

THE DEFENDANT: Yes, sir.

THE COURT: And it is your decision to rest your case when we come back from the break?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. All right, thank you, Mr. Russell, you can have a seat for us.

MS. RICHARDS: Your Honor, if we could put on the record I know we discussed at the bench with his prior convictions and I'm not sure if it got on the record. We had a question and I think that the clerk's office has clarified that the judgment and sentence that showed prior convictions was in error and that he had not been convicted of any felonies.

We discussed that also and I just wanted to make sure that was on the record.

THE COURT: That is true. We got the file and it looks like there had been a violation of community control and, you know, I don't want to go into whether or not you can, somebody can go to jail or, you know, not as a condition of probation but be sentenced without an adjudication but it looks like in this particular case, in

his case from several years ago, that's what happened and when the clerk typed it up they put an adjudication on it when it was withheld.

I don't know if the Department of Corrections would actually take somebody if the paperwork indicated withheld adjudication but, you know, that's all speculation because the paperwork indicated adjudication, the file itself indicated that it was withheld.

So—and what you want of record is you discussed that with your client and that if he did become a witness then that would not be part of the cross-examination because of the withheld adjudication, is that right?

MS. RICHARDS:  Yes, sir.

THE COURT:  Is that true, Mr. Russell, that you had that conversation?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  That the State wouldn't be allowed to ask that question about prior felony convictions?

THE DEFENDANT:  Yes, sir.

(Ex. D at 222–25).

Based upon this record, the state court reasonably concluded that Petitioner failed to show that his decision not to testify was based upon erroneous advice or incompetence by defense counsel. The certified copies of the judgment and sentence in Petitioner's prior criminal case stated that Petitioner was adjudicated guilty; therefore, it was reasonable for defense counsel to rely upon those documents in advising Petitioner that his prior convictions could be used for impeachment.  But even if counsel was deficient for failing to investigate the court file upon learning the discrepancy in the judgment and the clerk's on-line docket entries, counsel's advice not to testify was still reasonable.  Petitioner alleges he would have testified that he never wanted Kendall to die, that he loved her dearly, that at the time of the killing his emotions were "clouded" because she told him she was involved with someone else and no longer wanted to be with him, and that once he grabbed

her by the throat and pushed her backward against a wall, causing her head to hit it, he only remembers standing over her as she was lying on the ground.  Even if the State could not have impeached Petitioner with a prior conviction, the jury still would have had reason to question his credibility, because his testimony conflicted with his statements to Deputy Tyree:  (1) that he did not see Kendall after she reported to work at Arety's Angels the night before, (2) that he exchanged his car (the Impala) for her truck in the Arety's parking lot prior to her getting off work (Charlie Finch testified, and the security video surveillance confirmed, that Kendall left Arety's in the car, not a truck), (3) that Kendall never came home after her shift ended, and (4) that he had no involvement in Kendall's death.  Additionally, the jury heard Petitioner's admissions to Deputy Tyree that he and Kendall argued a lot, he hated the fact that she worked at Arety's, he was jealous, he had anger issues, he and Kendall had been arguing over the weekend before her death (Petitioner killed her the following Tuesday morning), and he thought she might have left him.  Considering the evidence adduced at trial, and Petitioner's proposed testimony, it was reasonable for defense counsel to advise Petitioner not to testify.

The state court reasonably applied Strickland in determining that Petitioner failed to show that his decision not to testify was based upon ineffective assistance of counsel.  Therefore, Petitioner is not entitled to relief on Ground Nine.

I.      Ground Ten:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution failed [sic] to file a motion to suppress evidence."

Petitioner contends defense counsel should have filed a motion to suppress evidence obtained during a warrantless search of his grandmother's property (doc. 1 at 29–31).  He alleges D'Aundra Evans told law enforcement that he participated in concealing Kendall's murder (id.).  Petitioner alleges law enforcement then went to Petitioner's grandmother's property on June 24, 2008, and searched it without establishing Evans's credibility or obtaining a search (id.).  He alleges law enforcement discovered a fresh mound of dirt and subsequently discovered Kendall's body (id.).  Petitioner alleges there were no exigent circumstances to warrant the illegal search (id.).  Additionally, he alleges that although his grandmother signed a written consent to search, she did not do so until June 25, 2008, the day after law enforcement entered and searched the property (id.).

He further alleges his grandmother would have denied law enforcement access to her property if she had known she could do so (*id.*).   Petitioner contends he had an interest in his grandmother's property (by virtue of his possessing a key to his grandmother's home, receiving some mail there, storing some of his personal belongings there, and occasionally staying there), and thus had an expectation of privacy in the property (*id.*).   He alleges that because the victim's body was discovered as a result of the illegal search, defense counsel should have objected to Dr. Broussard's testimony regarding injuries to the victim's body, including the cause of the injuries and the cause of death (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 26).   Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 26–28).

       1.       Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

       2.       Federal Review of State Court Decision

Petitioner raised this claim as Ground Nine in his second amended Rule 3.850 motion (Ex. I at 53–56).   The state circuit court adjudicated the claim as follows:

**Ground nine:  Illegal Search**

> Defendant asserts that the police entered and searched the property of Defendant's grandmother without a warrant or Defendant's consent.   Defendant avers that his grandmother would not have consented to the search had she known she could have refused.   Defendant argues that he had a valid expectation of privacy in the property, and had counsel filed a motion to suppress the fruits of the invalid search, the motion would have been granted, and he would not have been convicted of murder.
>
> At her deposition, Defendant's grandmother testified that she had "no reason" to bar the police from her property at the time of the search.   Moreover, at the time of the deposition, she "still" had no reason to bar the police from her property.[FN 20]   Contrary to Defendant's assertions, the Court finds that Defendant's grandmother would have consented to the search, even had she known she could refuse.   Counsel was not deficient for failing to file a motion to suppress that would not have been meritorious.

[FN 20:  *See* Attachment 6, excerpt from deposition.]

Additionally, Defendant has not shown prejudice.  He has failed to show that the police could not have simply obtained a warrant to search the property had Defendant's grandmother refused to allow the search or that the body would not have been discovered on the property had the police been forced to wait for a search warrant.  Moreover, at trial, the detective testified that the police were unsure who owned the property on which the body was buried.  The detective testified that the police obtained consent from both Defendant's grandmother and the owner of the adjacent property.  The detective testified that the police were uncertain whether the body was buried on the grandmother's property or the neighboring property and would have had to get a survey to be certain.[FN 21]  Defendant has not shown that he was prejudiced because he has not shown that the body was actually buried on his grandmother's property as opposed to the neighboring property.  Due to his failure to show either deficiency of counsel or prejudice to his cause, Defendant is not entitled to relief.

[FN 21:  *See* Attachment 1 at 179.]

(Ex. J at 108–09).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 39–42).  The First DCA affirmed without written opinion (Ex. M).

The record supports the state court's factual finding that Petitioner's grandmother would have consented to the search, even if she had known she could refuse.  At her deposition, Petitioner's grandmother, Betty Jo Russell, testified that she had "no reason not to let them come on my property" (Ex. J at 208).  She continued, "I still don't have any reason for them not to come on my property." (*id.* at 208–09).

Considering Ms. Russell's testimony, the state court reasonably concluded that Petitioner failed to show a meritorious basis for a motion to suppress.  Therefore, counsel was not ineffective for failing to file one.  *See* Brownlee v. Haley, 306 F.3d 1043, 1046 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); Chandler v. Moore, 240 F.3d 907, 917–18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious claim); Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue).

J.       Ground Eleven:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to file a motion to suppress Russell's statements."

Petitioner alleges he was asleep in his son's mother's apartment, when law enforcement burst into the room with guns drawn without consent or a warrant (doc. 1 at 31–33).  He alleges Detective Tyree woke him, put a gun in his face, placed him in handcuffs, and told him that he (Tyree) needed to speak with him at the police station (*id.*).  Petitioner alleges the officers did not advise him he was free to go or that he was not under arrest (*id.*).  He alleges that upon his arrival at the police station, a detective intimidated him by taking his cell phone, and then told him that he was a suspect in a homicide investigation, but never advised him that he was free to leave (*id.*).  Petitioner alleges he assumed he was under arrest and made statements to law enforcement (*id.*).  Petitioner alleges if the detective had told him he was not under arrest and was free to go, he would have left immediately instead of speaking to the detective (*id.*).  Petitioner alleges there is a strong possibility that the trial court would have granted a motion to suppress Petitioner's statements based upon the fact that he was illegally detained (*id.*).  He alleges the result of his trial could have been different if the jury had not heard his statements to the detective (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 28).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 28–29).

1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Ten in his second amended Rule 3.850 motion (Ex. I at 56–57).  The state circuit court adjudicated the claim as follows:

**Ground ten:  Defendant's Statements**

Defendant contends that counsel was ineffective for failing to move to suppress his statements to police.  Defendant argues that the statements were the product of police misconduct and a motion to suppress the statements would have been successful.

To prove that his counsel was ineffective for failing to file a motion to suppress, Defendant must show that, had the motion been filed, it would have been granted.  *See Gettel v. State*, 449 So. 2d 413, 414 (Fla. 2d DCA 1984) ("Trial

counsel's failure to file a motion to suppress the prescriptions was not ineffective assistance of counsel because we find that the motion to suppress would not, even if filed, properly have been granted").

This ground is insufficiently alleged. Upon its face, Defendant's allegations would establish that Defendant was subjected to a custodial interrogation. Defendant does not allege, however, any basis upon which a motion to suppress could have been grounded. Therefore, Defendant has not given the Court enough information to determine whether a motion to suppress the statements would have been successful.

In fact, the record reveals that Defendant agreed to accompany the investigator to the police station, the investigator read Defendant his rights, Defendant told the investigator he understood his rights, and he agreed to speak with the investigator.[FN 22]  In light of these facts, the Court finds nothing to indicate that a motion to suppress the statements would have been granted.  This allegation cannot entitle Defendant to relief.

[FN 22: *See* Attachment 1 at 172–73.]

(Ex. J at 109–10).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 43–45).  The First DCA affirmed without written opinion (Ex. M).

At trial, Detective Tyree testified that on June 24, 2008, he made contact with Petitioner at an apartment (Ex. C at 172).  He testified that Petitioner was asleep, and he woke him up (*id.*). Detective Tyree testified that Petitioner agreed to go with him to the sheriff's office (*id.*).  He testified that prior to interviewing Petitioner at the sheriff's office, he advised Petitioner of his Miranda rights (*id.*).  Detective Tyree testified that Petitioner indicated he understood his rights, and he agreed to speak with Tyree (*id.* at 172–73).  Tyree testified that after he and Petitioner spoke, he allowed Petitioner to leave but told Petitioner he most likely would be seeing him again (Ex. D at 187).  He testified Petitioner turned himself in two days later (*id.*).

Even if Petitioner was in custody at the sheriff's office, for purposes of Miranda, Petitioner does not deny that he was advised of his Miranda rights, he understood those rights, and he agreed to speak with Detective Tyree.  Petitioner failed to allege any meritorious basis for defense counsel to seek suppression of his statements.  Therefore, the state court's denial of this claim was not an unreasonable application of Strickland.

K.    <u>Ground Twelve: "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to file a motion to suppress photographs."</u>

Petitioner contends defense counsel was ineffective for failing to file a motion to suppress certain photographs of the victim's body (State's Exhibits 77A, 77C, and 77E through O), on the ground that they were irrelevant, duplicative, and designed to "inflame the emotions of the jury" (doc. 1 at 33–34). Petitioner alleges those photographs were of injuries caused during and after the victim's death, possibly during transportation and burial of the body, which were irrelevant to show the cause of death (*id.*). Petitioner alleges if counsel had pursued suppression of those particular photographs, the trial court would have granted the motion to suppress, and the result of his trial would have been different, because the jury's emotions would not have been inflamed (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 29–30). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 30–31).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Eleven in his second amended Rule 3.850 motion (Ex. I at 58–59). The state circuit court adjudicated the claim as follows:

**Ground eleven:  Irrelevant Photographs**

Defendant claims that counsel was ineffective for failing to move to "suppress" 11 of the 15 photographs admitted into evidence at trial.[FN 23] Defendant avers that these photographs were either of injuries caused after death or were duplicative of other photographs already admitted into evidence. Defendant argues that a motion to suppress the photographs would have been successful and the jury would not have "viewed these numerous photographs" that caused "their passions [to take] over and clouded their ability to rationally consider the evidence."

[FN 23:  The Court notes that relevancy of the photographs would have been properly challenged by objection rather than by a motion for suppression.]

This allegation is not facially sufficient because Defendant has failed to allege sufficient prejudice. The Court understands Defendant is alleging that the photographs were more prejudicial than probative, but Defendant has not explained his reasons for such an allegation. Defendant states that the numerosity of the photographs inflamed the passions of the jury. However, he does not explain why the jury would have been less rational after viewing multiple pictures than they would have been had they seen only the four that Defendant does not challenge. A review of the photographs at issue shows that the only photographs that depict the same injury are L, M, and N, each of which is a photograph of wounds on the victim's left forearm.[FN 24] Defendant has not indicated how two extra photographs of the scratches on the victim's forearm changed the outcome of his trial. Nor does Defendant explain how the introduction of pictures of "perimortem" wounds inflamed the passions of the jury. Defendant does not allege that the pictures were gruesome or otherwise shocking, nor does the Court find the photographs to be so. This allegation, therefore, is not facially sufficient.

> [FN 24: *See* Attachment 7, photographs. The Court notes that the original trial exhibits are mounted on a large poster board. To preserve the integrity of the exhibit, the Court did not remove the photographs from the board; rather, it took and printed digital photographs of each photographic exhibit for inclusion with the order. Upon request, the original poster board exhibit will be forwarded to the appellate court for its review.]

Furthermore, even had Defendant sufficiently alleged this ground, it would not entitle him to relief. Photographs that "bear on the issues of the nature and extent of injuries, the nature and force of the violence used, premeditation or intent are relevant." *Grey v. State*, 727 So. 2d 1063, 1065 (Fla. 4th DCA 1999). Moreover, photographs that are "useful in the medical examiner's explanation of the wounds on the body" are also relevant. *Segura v. State*, 972 So. 2d 1105, 1106 (Fla. 4th DCA 2008). The photographs admitted at trial were relevant in that they were probative of the injuries sustained by the victim, and they were useful to the coroner in his testimony.[FN 25] This allegation entitles Defendant to no relief.

> [FN 25: *See* Attachment 1 at 194–203.]

(Ex. J at 110–11). Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 45–47). The First DCA affirmed without written opinion (Ex. M).

The state court found as fact that the only photographs that were duplicative (i.e., they depicted the same injury) were State's Exhibits L, M, and N, each of which showed scratches on the victim's left forearm (Ex. J at 211–21.) Petitioner failed to show a reasonable probability that two

extra photographs of the scratches on the victim's forearm changed the outcome of his trial.  With regard to the remaining photographs identified by Petitioner, the state court found that there was no basis under state law for excluding them.  If the photographs were admissible under Florida law, as the Florida court has stated they were, defense counsel's performance in failing to challenge their admissibility cannot be considered deficient.  *See* Ladd v. Jones, 864 F.2d 108, 110 (11th Cir. 1989) (where "claims were meritless, it was clearly not ineffective for counsel not to pursue them.").  The state court's determination also means that Petitioner cannot show that he suffered prejudice resulting from his attorney's performance.  *See* Lockhart v. Fretwell, 506 U.S. 364, 374, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) ("the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law . . . .") (O'Connor, J. concurring).

Deferring to the state court's findings of fact and determinations on matters of state law, the state court did not unreasonably apply Strickland in denying this claim.  Therefore, Petitioner is not entitled to relief on Ground Twelve.

L.     Ground Thirteen:  "Russell was denied effective assistance of counsel when counsel under the Sixth Amendment to the United States Constitution neglected to impeach state's key witness."

Petitioner alleges D'Aundra Evans testified that he and Petitioner transported Kendall Rogers's body and buried it on Petitioner's grandmother's property, and then disposed of several items (the items discovered in dumpsters in Alabama) (doc. 1 at 34–35).  Petitioner contends defense counsel should have impeached Evans by inquiring whether he had been charged for his role in transporting and burying the body, and whether he received a "deal" or immunity in exchange for his testimony (*id.*).  Petitioner argues that the fact that the State never charged Evans with a crime proves that there was "some type of 'deal' made" (*id.* at 35).  Petitioner alleges if defense counsel had properly cross-examined Evans, the jury would have been aware of the fact that a "deal" was made and that Evans's testimony was induced by fear of being charged with an offense if he did not say what the State wanted him to say (*id.*).  He alleges the outcome of trial could have been different if defense counsel had presented this "impeachment" evidence to the jury (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 32).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 32–33).

>  1.     Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

>  2.     Federal Review of State Court Decision

Petitioner raised this claim as Ground Twelve in his second amended Rule 3.850 motion (Ex. I at 59–61).  The state circuit court adjudicated the claim as follows:

**Ground twelve:  Impeachment**

>  Defendant argues that counsel should have impeached the State's key witness, D'Aundra Evans.  Defendant alleges that counsel should have brought to the jury's attention that Evans was involved in the crime, but was not charged by the State, showing Evans's possible bias and undermining his credibility.

>  This allegation is not facially sufficient.  Defendant has not alleged what portion of Evans's testimony was damaging to his defense.  He does not dispute the facts to which Evans testified at trial.  In fact, Defendant continues to aver that he was responsible for the victim's death.  Defendant has failed to show how impeaching Evans's credibility would have assisted his defense, as the facts to which Evans testified were not in dispute.  Defendant has failed to show either deficiency of counsel or prejudice to his defense.

>  Even if this allegation was facially sufficient, it would still entitle Defendant to no relief.  Evans's involvement was clear from his testimony at trial.  Additionally, the jury had reason to disbelieve Evans.  He took the stand in a jumpsuit, indicated he was in juvenile detention, and testified he had been in possession of a stolen vehicle.[FN 26]  Defendant has not shown how Evans's credibility would have been more damaged by the jury's learning that Evans had not been charged with assisting Defendant in disposing of the evidence of the murder.  This allegation cannot entitle Defendant to relief.

>  [FN 26:  *See* Attachment 1 at 76–98.]

(Ex. J at 111–12).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 47–49).  The First DCA affirmed without written opinion (Ex. M).

Initially, Petitioner failed to proffer any reliable evidence that the State granted Evans immunity from prosecution in exchange for his testimony at Petitioner's trial.  Further, Petitioner did not allege that any aspect of Evans's testimony was untruthful.  Moreover, Petitioner failed to show a reasonable probability that the outcome of trial would have been different if Evans had been granted immunity in exchange for his testimony, and the jury had been made aware of it. Discounting Evans's testimony would not have changed the following evidence: (1) Petitioner told Deputy Tyree that he had anger and jealousy issues, that he and Kendall had been arguing the weekend before her death, and that he thought she may have left him; (2) Petitioner lied to Tyree about which vehicle Kendall drove when she left Arety's; (3) Kendall's body was found on Petitioner's grandmother's property; and (4) Kendall's and Petitioner's clothing and a shovel were discovered in dumpsters in Alabama.

Petitioner failed to demonstrate that the state court's adjudication of this claim was based upon an unreasonable determination of fact, or that it was an unreasonable application of Strickland. Therefore, he is not entitled to relief on Ground Twelve.

M.     Ground Fourteen: "Russell was denied effective assistance of counsel when counsel under the Sixth Amendment to the United States Constitution failed to object to improper comments made by state attorney."

Petitioner contends defense counsel should have objected to certain comments by the prosecutor during closing arguments (doc. 1 at 35–36).  He alleges the prosecutor's comment that Petitioner should have called 911 was improper, because Petitioner's action or inaction after the killing was irrelevant to the issue of premeditation, and the comment constituted an improper comment on his right against self-incrimination (*id.*).  He alleges the prosecutor also improperly commented that his motive for turning himself in to police was that his photograph was in the media, and he was afraid that someone would recognize him (*id.*).  He alleges this comment was improper because there was no evidence adduced at trial that his photograph was in the media before he turned himself in (*id.*).  Petitioner alleges the prosecutor's third improper comment was her statement that even though the jury would be instructed on justifiable homicide and excusable homicide, the jury could not choose either of those options (*id.*).  Petitioner contends there is a strong possibility the

outcome of trial would have been different if the jury had not heard these allegedly improper comments (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 33).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 33–34).

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Thirteen in his second amended Rule 3.850 motion (Ex. I at 61–63).  The state circuit court adjudicated the claim as follows:

**Ground thirteen:  Prosecutorial Comments**

Defendant challenges his counsel's failure to object when the State made various comments in closing argument.  Defendant asserts that counsel should have objected to the following comments:  1) Defendant should have called 911; 2) Defendant only turned himself in to authorities because he feared someone would recognize him from his picture in the media; and 3) the jury "can not choose" either justifiable homicide or excusable homicide.

"[T]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Gonzalez v. State*, 990 So. 2d 1017, 1028–1029 (Fla. 2008) (internal citations omitted).  *See also Dessaure v. State*, 891 So. 2d 455, 468 (Fla. 2004) (recognizing that "[c]losing argument presents an opportunity for both the State and the defendant to argue all reasonable inferences that might be drawn from the evidence").

A review of the prosecutor's closing argument shows that the prosecutor did nothing unseemly.  She simply recited the evidence that had been adduced at trial and suggested reasonable inferences that the jury could draw from that evidence.[FN 27] Although Defendant seems to suggest that no evidence was adduced regarding his picture in the media, there was testimony on this point from the investigating officer.[FN 28]  The Court finds no ineffectiveness of counsel with regard to the State's closing argument.

[FN 27:  *See* Attachment 1 at 235–43 and 249–59.]

[FN 28:  *See* Attachment 1 at 188.]

(Ex. J at 112–13).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at 49–53).  The First DCA affirmed without written opinion (Ex. M).

The state court found that there was no basis under state law for objecting to the prosecutor's comments as improper.  If the comments were proper under Florida law, as the Florida court has stated they were, defense counsel's failure to object cannot be considered deficient.  *See* <u>Ladd</u>, 864 F.2d at 110.  Further, the state court's determination that the comments were proper also precludes Petitioner from showing that he was prejudiced by counsel's failure to object.  *See* <u>Lockhart</u>, 506 U.S. at 374.

Petitioner failed to satisfy § 2254(d) with regard to Ground Fourteen.  Therefore, he is not entitled to federal habeas relief.

      N.     <u>Ground Fifteen:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to 'timely object' (prior to plea entry) to the invalid/defective information filed by the State on 7-17-08, which resulted in the Russell [sic] being unconstitutionally tried and convicted without being 'duly charged' with the commission of an offense by indictment, and failed to timely object to the indictment on the grounds of untimeliness."</u>

Petitioner alleges he was arrested on June 26, 2008, and formally charged by information with second degree murder on July 17, 2008 (doc. 1 at 37–38).  He argues the charging document was defective because it failed to include a sworn statement form a material witness, namely, D'Aundra Evans (*id.*).  Petitioner alleges defense counsel allowed him to enter a plea (of not guilty) to the information knowing that it was defective (*id.*).  He alleges after Evans initially spoke to police and led them to the victim's body, Evans was unable to be located (*id.*).  Petitioner alleges Evans did not provide a sworn statement to police until December 31, 2008, which was outside the time frame set forth in Rule 3.134 of the Florida Rules of Criminal Procedure (doc. 1 at 37–38; doc. 34 at 56). He alleges if defense counsel had objected to the information as defective, it would have been dismissed, and the State would not have been able to timely amend it to charge him with first degree murder (*id.*).

Respondent asserts Petitioner presented this claim in his second amended Rule 3.850 motion, except for his allegation that the State would not have been able to amend the information to remedy

any deficiency (doc. 21 at 35).  Respondent contends that allegation was not presented to the state

courts, and has no support in the record (*id.*).  Respondent argues that the state court's adjudication

of the claim presented to it was not based upon an unreasonable determination of the facts, nor was

it contrary to or an unreasonable application of clearly established federal law (*id.* at 35–36).

> 1.    **Clearly Established Federal Law**

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

> 2.    **Federal Review of State Court Decision**

Petitioner argued in Ground Fourteen of his second amended Rule 3.850 motion that defense

counsel was ineffective for failing to seek dismissal of the information on the ground that it did not

include a sworn statement from a material witness (Ex. I at 63–65).  The state circuit court

adjudicated the claim as follows:

**Ground fourteen:  Invalid Charging Document**

> Defendant contends that counsel was ineffective for failing to lodge an
> objection to the Information due to the lack of a sworn statement under oath from a
> material witness.  When the Indictment was handed down, Defendant claims it too
> was invalid because it was an amendment of the invalid Information.

> Defendant has failed to allege sufficient prejudice.  Defendant has not shown
> that, had counsel made the objection, the State could not simply have amended the
> Information to remedy any deficiency.  This allegation cannot entitle him to relief.

(Ex. J at 113).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. K at

53–55).  The First DCA affirmed without written opinion (Ex. M).

The criminal procedural rule cited by Petitioner provides:

> The state shall file formal charges on defendants in custody by information, or
> indictment . . . within 30 days from the date on which the defendants are arrested or
> from the date of the service of capiases upon them.  If the defendants remain
> uncharged, the court on the 30th day and with notice to the state shall:

> (1) Order that the defendants automatically be released on their own recognizance
> on the 33rd day unless the state files formal charges by that date; or

> (2) If good cause is shown by the state, order that the defendants automatically be
> released on their own recognizance on the 40th day unless the state files formal
> charges by that date.

In no event shall any defendants remain in custody beyond 40 days unless they have been formally charged with a crime.

Fla. R. Crim. P. 3.134.

The Florida Rules of Criminal Procedure require that an information "shall be signed by the state attorney, or a designated assistant state attorney, under oath stating his or her good faith in instituting the prosecution and certifying that he or she has received testimony under oath from the material witness or witnesses for the offense." Fla. R. Crim. P. 3.140(g). Florida courts have held that an assistant state attorney who signs an information need not personally administer an oath to, personally question, or see and hear the testimony of the material witness or witnesses upon which charges are based. *See* State v. Hartung, 543 So. 2d 236, 237 (Fla. 5th DCA 1989). The testimony of a material witness may be sworn to before anyone authorized to administer an oath, and then transmitted to the state. *Id.* The assistant state attorney can then "properly certify that he has received testimony under oath from the material witness . . . ." *Id.*; *see also* State v. Williams, 362 So. 2d 678, 680 (Fla. 4th DCA 1978) (when the assistant state attorney swears that the allegations set forth in the information are based upon facts that have been sworn to as true by the material witnesses, that is tantamount to his or her "certifying that he [or she] has received testimony under oath from the material witness or witnesses for the offense."). Law enforcement officers are authorized to administer oaths when engaged in the performance of official duties. *See* Fla. Stat. § 117.10.

Rule 3.140(g) further provides, "No objection to an information on the ground that it was not signed or verified, as herein provided, shall be entertained after the defendant pleads to the merits." Fla. R. Crim. P. 3.140(g).

Rule 3.140 additionally provides:

**(o) Defects and Variances**. No indictment or information, or any count thereof, shall be dismissed . . . on account of any defect in the form of the indictment or information or of misjoinder of offenses or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.

Fla. R. Crim. P. 3.140(o).

In Petitioner's case, the probable cause narrative of Deputy Tyree, as well as Tyree's affidavit for a search warrant, states that he conducted a recorded interview with D'Aundra Evans on June 24, 2008, at 5:55 p.m., during which Evans stated that earlier that day, Petitioner woke him at 6:00–7:00 a.m. and drove him to Petitioner's apartment (Ex. A at 10–13, 26–30). Evans reported that at the apartment, Petitioner drug a blanket from his bedroom, which appeared to contain a body (*id.*). Evans reported that Petitioner stated, "We're going to bury a body and the body is Kendall" (*id.*). Evans reported that he assisted Petitioner in placing the victim in the back of a truck, then rode in the truck to Petitioner's grandmother's house (*id.*). The two then used a "four-wheeler" to transport the victim into the woods, where they buried the body (*id.*). Evans reported that they returned to Petitioner's apartment, and while Petitioner showered, Evans was tasked with wiping the floor (*id.*). Evans reported Petitioner told him to follow him in Petitioner's while Impala while Petitioner drove the victim's white Chevy truck (*id.*). Evans reported driving to Alabama, where Petitioner disposed of evidence in three separate dumpsters and left the victim's truck in a parking lot (*id.*).

Petitioner turned himself in to the custody of law enforcement on June 26, 2008. An information charging him with second degree murder was filed on July 17, 2008 (Ex. A at 3). The information was signed by Assistant State Attorney Brenda A. Neel and notarized by Karen Ann Williams with the following verification:

> Before me personally appeared the undersigned designated Assistant State Attorney for the First Judicial Circuit of Florida, being personally known to me, and who first being duly sworn, says that the allegations set forth in the foregoing information are based on facts that have been sworn as true, and which if true, would constitute the offense wherein charged, that said Assistant State Attorney has received testimony under oath from a material witness or witnesses for the offense and that this prosecution is instituted in good faith.

(*id.*). The docket sheet reflects that Petitioner appeared in court on July 18, 2008, and entered a plea of not guilty, and the court set the case for jury trial on November 3, 2008, pursuant to Rule 3.125(k) (*see* Ex. A, Docket Sheet).

Based upon the state court record and relevant Florida law, Petitioner failed to show that no competent counsel would have failed to file a motion to dismiss the information on the ground that it failed to include a sworn statement form a material witness. Further, Petitioner failed to show a

reasonable probability of a different outcome if defense counsel had filed a motion to dismiss the information.  The alleged defect was one of form, and was not in the nature of a defect justifying dismissal under Rule 3.140(o).  Further, as the state post-conviction court noted, Petitioner failed to show that the state attorney could not have corrected the alleged defect by filing an amended information.  And even if the state attorney could not have filed an amended information within 40 days from Petitioner's arrest, due to Evans's alleged unavailability (an assertion for which Petitioner provides no factual support), Petitioner would only have been entitled to release on his own recognizance; he would not have been immune from being charged with first degree murder.[14]

Petitioner failed to demonstrate that the state court's adjudication of this claim was an unreasonable application of Strickland.  Therefore, he is not entitled to federal habeas relief on Ground Fifteen.

O.    Ground Sixteen:  "Mr. Russell was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to have Russell testify during a pre-trial hearing."

Petitioner alleges defense counsel should have called him to testify at the pre-trial hearing on the State's motion in limine to exclude evidence of Petitioner's organic brain impairment (doc. 1 at 38–39).  He alleges he would have testified that during the killing, his mind was "clouded" and he "reacted before he knew what he was doing" (id. at 38).  He alleges he also would have testified that he "suffered a blackout which also been [sic] documented throughout his childhood" (id. at 39).  Petitioner contends if he had testified, the trial court would have denied the motion in limine, thus allowing Dr. Turner to testify consistently with his report, and the outcome of his trial would have been different (id.).

Respondent contends Petitioner failed to present this issue to the state courts, and he is now procedurally barred from attempting to do so (doc. 21 at 36).  Respondent contends that even if Petitioner relies on Martinez v. Ryan, 132 S. Ct. 1309 (2012) to demonstrate cause for his procedural default, Petitioner cannot demonstrate a substantial claim of ineffective assistance of counsel,

---

[14] Double jeopardy protections would not have prohibited the State from charging Petitioner with murder.  The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from being subjected to multiple prosecutions for the same offense.  See U.S. Const. amend. V.  Jeopardy does not attach until the jury is empaneled and sworn.  See United State v. Therve, 764 F.3d 1293, 1298 (11th Cir. 2014) (citation omitted).

because he cannot show prejudice (*id.* at 36–37).  Respondent contends Dr. Turner's testimony that Petitioner may have suffered from diminished capacity or an irresistible impulse in committing the offense would not have established a valid defense in Florida (*id.* at 37).  Further, Petitioner's alleged testimony that he suffered a blackout would have had no bearing on the admissibility of Dr. Turner's testimony, which was the issue at the pre-trial hearing (*id.*).

As Respondent predicted, Petitioner relies upon Martinez as cause for his failure to present this claim to the state courts (doc. 34 at 58–65).  He alleges he was not represented by counsel during the Rule 3.850 proceeding (*id.* at 60).  He further argues his underlying ineffective assistance of counsel claim is substantial, and this court should permit discovery and an evidentiary hearing on his underlying claim to determine, for example, whether defense counsel had a strategic or tactical reason for not presenting Petitioner's testimony at the pre-trial hearing, and to assess the effect of counsel's performance (*id.* at 60–63).  Petitioner alleges Dr. Turner's report not only established diminished capacity and irresistible impulse, Dr. Turner also concluded that Petitioner's mental defects prohibited him from carefully considering his options (*id.* at 64).  Petitioner alleges his inability to carefully consider his options prohibited him from forming a premeditated intent (*id.*).  He also alleges that if he had testified at the pre-trial hearing that "during the incident he suffered from a blackout and could not remember the situation entirely," the court would have ruled that Dr. Turner's testimony was admissible (*id.* at 65).

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  Wainwright v. Sykes, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray, 477 U.S. at  488).  Before its 2012 decision in Martinez, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause.  *See* Coleman, 501 U.S. at 752–53.  Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should

have been raised, was ineffective under the standards of Strickland [v. Washington, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, 132 S. Ct. at 1318–19 (citations omitted).  Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 688).

In Hittson, the Eleventh Circuit explained:

[T]he merits of the underlying claim is only a part of the Strickland analysis. With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised.   However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. Murray, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation."  Id. at 751, 103 S. Ct. at 3313.

As we have explained, Strickland instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 689–90, 104 S. Ct. at 2065–66.  To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Thus, to show that his habeas counsel failed to provide the level of representation required by Strickland, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

<u>Hittson</u>, 759 F.3d at 1263 (footnote omitted).

The Eleventh Circuit then explained <u>Martinez</u>'s "substantial claim" requirement:

> <u>Martinez</u> articulated the "substantial claim" requirement as follows:
>
> To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf.* <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).

<u>Martinez</u>, — U.S. at —, 132 S. Ct. at 1318–19. Neither <u>Martinez</u> nor <u>Trevino</u> [<u>v. Thaler</u>, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to <u>Miller–El</u> to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

As the Court explained in <u>Miller–El</u>, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." <u>Miller–El</u>, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of

the denial of a constitutional right."  In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from <u>Strickland</u>.

<u>Hittson</u>, 759 F.3d at 1269–70 (footnotes omitted).

As previously discussed, the state court record shows that defense counsel filed a Notice of Intent to Rely on Mental Health Defense Other than Insanity (Ex. A at 193).  The Notice stated that the defense intended to rely on the mental health defense of Organic Brain Impairment, and would seek to establish the Organic Brain Impairment by presenting testimony from Dr. Turner (*id.*).  The State filed a motion in limine to prohibit the introduction of Dr. Turner's testimony, or any testimony and documentation, that Petitioner suffered from Organic Brain Impairment and/or Cognitive Disorder Not Otherwise Specified (Ex. B at 232).  At the pre-trial hearing on the State's motion in limine, defense counsel advised the court that Dr. Turner did not provide her with his report until the day before the pre-trial hearing, and that she had not had an opportunity to discuss it with him but planned to do so the next day (the day after the hearing) (Ex. A at 199).  Dr. Turner's report was filed with the court, which included a description of his clinical interview with Petitioner (Ex. B at 202, 208–19).  The parties argued the legal issue of the admissibility of evidence of mental impairment (Ex. A at 194–200, Ex. B at 201–06).  Defense counsel advised the court that in speaking with Dr. Turner, she intended to discuss the issue of Petitioner's suffering from blackouts, which would be determinative of whether his testimony would be admissible under an exception to the general rule that evidence of mental impairment short of insanity was inadmissible (Ex. B at 203–04).  The trial court ruled that unless defense counsel notified the court, after speaking with Dr. Turner, that his testimony fit within an exception to the general rule of inadmissibility, the State's motion in limine would be granted, and Dr. Turner's testimony would be precluded (*id.* at 205).  That ruling was not revisited prior to or during trial.

Jurists of reason would not find it debatable whether Petitioner has stated a valid ineffective assistance of counsel claim with regard to counsel's failure to present his testimony at the hearing on the State's motion in limine.  As discussed *supra* in Ground One, Dr. Turner's report did <u>not</u> indicate that Petitioner lacked the capacity to form a premeditated intent, or that his mild symptoms of organic brain impairment prevented him from forming a premeditated intent or affected his consciousness prior to or at the time of the killing.  Instead, Dr. Turner's report indicated that

Petitioner's brain impairment <u>diminished</u> his ability to control his emotions and behavior. However, irresistible impulse and diminished capacity are not valid defenses in Florida. *See* <u>Morgan v. State</u>, 639 So. 2d 6 (Fla. 1994) (irresistible impulse); <u>Evans v. State</u>, 946 So. 2d 1 (Fla. 2006) (holding that trial counsel was not ineffective for failing to present evidence that the defendant suffered from a head injury which led to a deficiency in impulse control, which, in turn, led to the defendant's inability to control his rage and violent behavior, because such evidence was evidence of diminished capacity, which was not a viable defense in Florida). Petitioner's proposed testimony, that at the time of the killing, his mind was "clouded" and he "reacted before he knew what he was doing," was simply additional evidence of diminished capacity and thus insufficient to render evidence of his mental impairment admissible.

Petitioner additionally alleges he would have testified that he suffered a "blackout," but he uses that term interchangeably with "memory loss" (*see* doc. 1 at 23). He more specifically described his mental state as follows:

> Russell would have testified that he and victim were involved in a very intense and emotional argument dealing with their relationship. Victim told Russell that she was involved with someone else and no longer wanted to be with him. Russell's mind went into a clouded frenzy; he grabbed the victim by the throat pushing her back causing her head to crash against the wall. The next thing Russell remembers is the victim lying on the ground and he is standing over her.

(doc. 1 at 24). Obviously, Petitioner remembered engaging in the conduct that caused Kendall's death, i.e., grabbing her by the throat and causing her head to crash against the wall (the medical examiner testified that the cause of Kendall's death was homicidal violence, including blunt force head and neck trauma). The fact that the next thing he remembered was standing over her body while she was lying on the ground does not suggest he was unable to consciously decide to kill her prior to doing so, or that he was unable to have that decision in his mind at the time he killed her.

No reasonable jurist could disagree that Petitioner has not stated a valid ineffective assistance of counsel claim with regard to counsel's failure to present his testimony at the hearing on the State's motion in limine. Therefore, he has not shown cause for his procedural default under <u>Martinez</u>, and thus is not entitled to federal review of Ground Sixteen.

P.      Ground Seventeen:  "Mr. Russell was denied his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel failed to request a heat of passion jury instruction."

Petitioner contends defense counsel should have requested a "heat of passion" jury instruction in light of the evidence that he loved the victim and wanted to be with her forever, and that he knew she was cheating on him and wanted to leave him (doc. 1 at 39).  He alleges if counsel had requested the jury instruction, the outcome of his trial would have been different (*id.*).

Respondent contends Petitioner failed to present this issue to the state courts, and he is now procedurally barred from attempting to do so (doc. 21 at 37).  Respondent contends that even if Petitioner relies on Martinez v. Ryan, 132 S. Ct. 1309 (2012) to demonstrate cause for his procedural default, Petitioner cannot demonstrate a substantial claim of ineffective assistance of counsel, because he cannot show prejudice (*id.* at 37–38).  Respondent contends the trial court determined in its analysis of Grounds Seven and Eight, *supra*, that the facts did not support a heat-of-passion defense; therefore, Petitioner failed to show a substantial claim of ineffective assistance of counsel with regard to counsel's failure to request a heat-of-passion jury instruction (*id.* at 38).

Petitioner again relies upon Martinez to overcome the procedural default (doc. 34 at 65–74). He again contends this court should permit discovery and hold an evidentiary hearing (*id.* at 67–70). He contends the evidence at trial was sufficient to support a heat-of-passion jury instruction (*id.* at 72–73).

Under Florida law, a defendant is entitled to have a jury instruction on any valid defense supported by the evidence, but "a trial judge is not required to give an instruction where there is no nexus between the evidence in the record and the requested instruction."  Wheeler v. State, 4 So. 3d 599, 605 (Fla. 2009) (internal quotation marks and citation omitted).  Moreover, "[i]n order to be entitled to a special jury instruction, [the defendant] must prove:  (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing."  *Id.* (citing Stephens v. State, 787 So.2d 747, 756 (Fla. 2001)).

Florida's special instruction on "heat of passion" states:

An issue in this case is whether (defendant) did not have a depraved mind without regard for human life because [he] [she] acted in the heat of passion based on

adequate provocation.  In order to find that the defendant did not have a depraved mind without regard for human life because [he] [she] acted in the heat of passion based on adequate provocation:

> a.  there must have been a sudden event that would have suspended the exercise of judgment in an ordinary reasonable person; and

> b.  a reasonable person would have lost normal self-control and would have been driven by a blind and unreasoning fury; and

> c.  there was not a reasonable amount of time for a reasonable person to cool off; and

> d.  a reasonable person would not have cooled off before committing the act that caused death; and

> e.  the (defendant) was, in fact, so provoked and did not cool off before [he] [she] committed the act that caused the death of (victim).

If you have a reasonable doubt about whether the defendant had a depraved mind without regard for human life because [he] [she] acted in the heat of passion based on adequate provocation, you should not find [him] [her] guilty of Second Degree Murder.

The Florida Bar, Florida Standard Jury Instructions in Criminal Cases, Part Two:  Instructions on Crimes, Chp. 7, § 7.4 Murder—Second Degree.

In Petitioner's case, the trial court gave the standard jury instruction on excusable homicide, which includes a reference to "heat of passion" in its definition (Ex. B at 233).[15]  The court also gave

---

[15] The excusable homicide instruction stated:

> The killing of a human being is excusable, and therefore lawful, under any one of the following three circumstances:

> > 1.    When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or

> > 2.    When the killing occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or

> > 3.    When the killing is committed by accident and misfortune resulting from a sudden combat, if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner.

the standard jury instruction on premeditation (*id.* at 234).[16]  Considering the evidence adduced at trial, Petitioner failed to show that a special instruction on heat of passion was supported by the evidence.

No reasonable jurist could disagree that Petitioner has not stated a valid ineffective assistance of counsel claim with regard to counsel's failure to request a heat-of-passion jury instruction. Therefore, he has not shown cause for his procedural default under <u>Martinez</u>, and thus is not entitled to federal review of Ground Seventeen.

Q.      <u>Ground Five:  "Russell was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing."</u>

In this claim, Petitioner essentially contends that the cumulative effect of defense counsel's alleged deficiencies deprived him of a fair trial (doc. 1 at 21–23; doc. 34 at 25–27).  He alleges during opening statements, defense counsel stated that she was going to agree with much of the State's case, and she expected the evidence to show that Petitioner was responsible for Kendall Rogers's death, but she asked the jury to pay attention to what happened to Kendall at the time of her death (*id.*).  He alleges defense counsel cross-examined only "a couple" of the State's witnesses, and then asked them only "a couple" of questions (*id.*).  He alleges defense counsel failed to present any evidence to refute the State's case and neglected to have him testify on his own behalf even though he "wanted to explain to the jury what actually happened and why" (*id.*).  He alleges counsel

---

(Ex. B at 233).

[16] The court instructed the jury as follows with regard to premeditation:

"Killing with premeditation" is killing after consciously deciding to do so.  The decision must be present in the mind at the time of the killing.  The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing.  The period of time must be long enough to allow reflection by the defendant.  The premeditated intent to kill must be formed before the killing.

The question of premeditation is a question off fact to be determined by you from the evidence.  It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at the time of the killing.

(Ex. B at 234).

Case No.:  3:13cv519/LAC/EMT

failed to provide a viable defense, even though different defenses were available, such as "heat of passion" or insanity (*id.*).  He alleges defense counsel failed to make a detailed argument in favor of a motion for JOA and instead simply stated that the State failed to prove premeditation (*id.*).  He alleges during closing argument, defense counsel conceded several elements of the crime charged, and even conceded his guilt of a lesser included offense (*id.*).  Petitioner contends the effect of defense counsel's comments to the jury, failure to subject the State's witnesses to adversarial testing, and failure to present defense evidence, relieved the State of it burden of establishing his guilt beyond a reasonable doubt and deprived him a fair trial (*id.*).  Petitioner argues that even if the multiple errors of counsel are deemed individually harmless, the cumulative effect of such errors denied him a fair trial (*id.*).

Respondent concedes Petitioner exhausted this claim (doc. 21 at 15).  Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 15–16).

        1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Four in his second amended Rule 3.850 motion (Ex. I at 7).  The state circuit court adjudicated the claim as follows:

**Ground four:  Adversarial Testing**

Defendant avers that his counsel did very little to defend him at trial.  He states that she conceded his responsibility for the victim's death in opening statement, asked few to no questions on cross examination of the State's witnesses, presented no defense of any kind, and called no witnesses on behalf of the defense, not even Defendant himself.  In closing argument, counsel compounded the problems when she again conceded that Defendant was responsible for the victim's death.  Defendant asserts that these errors kept the jury from viewing Defendant as innocent until proven guilty.

"[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."  *Griffin v. State*, 866 So. 2d

1, 22 (Fla. 2003).  As the Court has not found merit in Defendant's individual allegations, Defendant is not entitled to relief on his claim of cumulative error.

(Ex. J at 101).  Petitioner presented argument on this issue in his initial brief on appeal to the First DCA (Ex. K at 24–26).  The appellate court affirmed the lower court's decision without written opinion (Ex. M).

The Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims.[17]  Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[18] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254.  *See, e.g.,* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law); Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998)

---

[17] The Eleventh Circuit has noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." Forrest v. Fla. Dep't of Corr., 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished).  The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."  *Id.* at 5 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

[18] *See* United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted); United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995)), United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)).

(applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[19]

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); see also United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); United States v. Hardy, 224

---

[19] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. See Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. See Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. See Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. See Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

F.3d 752, 757 (8th Cir. 2000); <u>Angelone</u>, *supra*; <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1113 (10th Cir. 1998); <u>United States v. Rivera</u>, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); <u>United States v. Conteh</u>, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007). Thus, Petitioner must show error with respect to at least two of his individual claims.

As previously discussed, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors of trial counsel.  Therefore, he is not entitled to federal habeas relief on this "cumulative error" claim.

V.    PETITIONER'S MOTIONS FOR DISCOVERY AND AN EVIDENTIARY HEARING

Petitioner contends he is entitled to an evidentiary hearing because he has alleged facts which, if proven, would entitle him to relief on all of his claims, and he was not afforded an evidentiary hearing in state court (*see* doc. 37 at 9–12).  He also requests that the court permit discovery in this case to enable him to prepare for the evidentiary hearing, and he requests that the court compel Respondent to "disclose any and all discovery pertaining to petitioner's habeas corpus" (doc. 35).

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  <u>Bracy v. Gramley</u>, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997).  Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts ("Rule 6") provides that "a party requesting discovery must provide reasons for the request" and "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  The United States Supreme Court has explained that Rule 6 is to meant to be consistent with <u>Harris v. Nelson</u>, 394 U.S. 286, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969).  *See* <u>Bracy</u>, 520 U.S. at 909; *see also* Habeas R. 6 Advisory Committee's Notes.  Pursuant to <u>Harris</u>, a petitioner establishes "good cause" for discovery if "specific allegations before the court show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." <u>Harris</u>, 394 U.S. at 300.  "[G]ood cause for discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure hypothesis."  <u>Arthur v. Allen</u>, 459 F.3d 1310, 1311 (11th Cir. 2006).

In Isaacs v. Head, 300 F.3d 1232 (11th Cir. 2002), the Eleventh Circuit addressed the issue of discovery in 28 U.S.C. § 2254 cases and explained that a petitioner is not entitled to discovery if he was not reasonably diligent in his pursuit of discovery at the state level. The court held that in passing the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Id.* at 1248–49. The court found that Isaacs had not been "reasonably diligent in trying to develop the factual record while in state court" and the district court had, therefore, correctly denied his requests for both discovery and an evidentiary hearing. *Id.* at 1249. According to the Eleventh Circuit, when a petitioner has not been reasonably diligent at the state level, he may obtain discovery in the district court only if he meets the stringent requirements of 28 U.S.C. § 2254(e)(2). *Id.*

The Eleventh Circuit addressed the issue of discovery again in Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002). During state habeas proceedings, Crawford obtained a Georgia Bureau of Investigation ("GBI") report that included information about various stains on a mattress, blankets, and clothing. One day before the evidentiary hearing in the state habeas corpus court, Crawford filed a motion for independent serological testing on these items. The state court denied the motion as untimely. *Id.* at 1328–29. In his federal habeas action, Crawford again requested to have the items tested. The Eleventh Circuit explained that the district court correctly denied discovery because "Crawford failed to exercise sufficient diligence in seeking testing of items mentioned in the GBI report while in state court." *Id.* at 1329. The court held that "in light of both § 2254(e)(2) and Rule 6(a), we conclude that Crawford was not entitled to have the items from the GBI report tested after bringing his case in the federal courts." *Id.*

Thus, in both Isaacs and Crawford, the Eleventh Circuit denied discovery because the habeas petitioners failed to exercise sufficient diligence to obtain the sought-after discovery in the state courts and could not meet the stringent requirements of § 2254(e)(2).

It appears that, as a practical matter, the Supreme Court's decision in Cullen v. Pinholster, —U.S. —, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) places further restrictions on discovery. In Pinholster, the Court made it clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from

doing so." *Id.* at 1401.  The Court addressed whether habeas review "under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal court." *Id.* at 1398. The Court held that when the state court has decided an issue on the merits, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*  Likewise, based on the plain language in the statute itself, review under § 2254(d)(2) is limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Pinholster, 131 S. Ct. at 1400 n.7.

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2) [or Pinholster], the decision to grant such a hearing rests in the discretion of the district court." Schriro v. Landrigan, 550 U.S. 465, 468, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); *see also* Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts.  When deciding whether to grant a hearing, the "court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," taking into consideration the "deferential standards prescribed by 28 U.S.C. § 2254." Schriro, 550 U.S. at 474.  An evidentiary hearing is not necessary if the issues can be resolved by reference to the record developed in the state courts.  *Id.*

While Pinholster addressed evidentiary hearings, district courts have found that its linkage to  discovery is unquestionably present.  *See, e.g.*, Butts v. Chatman, No. 5:13cv194 (MTT), 2014 WL 185339, at *1 n.2 (M.D. Ga. Jan. 15, 2014) (unpublished) (while Pinholster addressed only evidentiary hearings, there would be no need for discovery if Pinholster barred the court from considering any newly discovered evidence); Coddington v. Cullen, No. CIV–S–01–1290 KJM GGH DP, 2011 WL 2118855 (E.D. Cal. May 27, 2011) (unpublished) (explaining that "the extent of permissible discovery in a habeas corpus action, seemingly once settled, has been upset by the AEDPA ruling of . . . [Pinholster]").  After Pinholster, if the state court decided a particular claim on the merits, this court is not authorized to hold an evidentiary hearing in which new evidence is introduced to support that claim.  Thus, it would seem that obtaining discovery on that claim would be futile.  Courts faced with discovery requests post-Pinholster have explained:

> [A]ny new evidence unearthed during discovery in federal court and "later
> introduced in federal court is irrelevant to § 2254(d) (1) [and (2)] review."  In other

> words, if the state trial court adjudicated . . . [petitioner's claims] on the merits, such
> that [p]etitioner must satisfy the terms of § 2254(d), "good cause" does not exist for
> the discovery [p]etitioner seeks . . . because this Court may look only to the state
> court record in applying § 2254(d).

Hurst v. Branker, No. 1:10–CV–725, 2011 WL 2149470 (M.D.N.C. June 1, 2011) (unpublished)
(quoting Pinholster, 131 S. Ct. at 1400)).

In the instant case, as discussed *supra*, the state court adjudicated Grounds One through
Fifteen on the merits, and Petitioner failed to demonstrate that the state court's adjudication of any
of those claims resulted in a decision that was based on an unreasonable determination of the facts
in light of the evidence presented to it, or resulted in a decision that was contrary to or an
unreasonable application of federal law. Therefore, this court is not authorized to receive new
evidence on those claims.

With regard to the two claims that were not adjudicated by the state courts, Petitioner has
not demonstrated that "jurists of reason would find it debatable whether the petition states a valid
claim of the denial of a constitutional right." *See* Hittson, 759 F.3d at 1269–70 (citing Slack, 529
U.S. at 484). Therefore, he is not entitled to discovery or an evidentiary hearing on those claims
either. Accordingly, his motions for discovery and an evidentiary hearing should be denied.

VI.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court
must issue or deny a certificate of appealability when it enters a final order adverse to the applicant,"
and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing
required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court
issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28
U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L.
Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the
undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court
may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is

an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That Petitioner's "Motion to Request/Compel Discovery" (doc. 35) and "Request for an Evidentiary Hearing with his Suggestions in Support" (doc. 37) be **DENIED**.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 24th day of April 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

      **Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**